UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 4:23CR380 SRC/PLC |
| | ) |
| SONNY SAGGAR, M.D., and | ) |
| RENITA BARRINGER, | ) |
| | ) |
| Defendants. | ) |

FILED
JUL 2 6 2023
U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

## INDICTMENT

The Grand Jury charges:

### BACKGROUND

**A. Defendants**

1. At all times relevant to this indictment, defendant Sonny Saggar, M.D. ("Dr. Saggar") was a medical doctor, licensed to practice in the state of Missouri. Since at least as early as 2012, Dr. Saggar has owned and operated one or more health care related businesses, including: Downtown Urgent Care LLC; Creve Coeur Urgent Care LLC; and, since in or about September 2017, St. Louis General Hospital (SLGH). At all relevant times, SLGH was an urgent care and primary care clinic that had two locations: one at 916 Olive Street, St. Louis, Missouri 63101 (the Downtown Location), and the other at 13035 Olive Boulevard, Creve Coeur, Missouri 63141 (the Creve Coeur Location). At all relevant times, Dr. Saggar was listed as the president of SLGH and as a member of the board of directors for SLGH.

2. At all times relevant to this indictment, defendant Renita Barringer (Barringer) was the office manager for SLGH. As the office manager of SLGH, Barringer's responsibilities included the day-to-day operations, staffing, schedules, credentialing, billing, and other

1

administrative duties. On or about April 14, 2020, Barringer was added as a member of the board of directors for SLGH. On or about April 21, 2023, Barringer also became the secretary for SLGH.

    3.    At all relevant times, Co-Conspirator No. 1 was a medical doctor, licensed to practice in the state of Missouri. In or about January 2022, Co-Conspirator No. 1 became employed as a physician at the Creve Coeur Location of SLGH, as further described below in this indictment.

### B. Requirements Regarding Assistant Physicians in the State of Missouri

    4.    In Missouri, an "assistant physician," or "AP," is any medical school graduate who:

(a) Is a resident and citizen of the United States or is a legal resident alien;

(b) Has successfully completed Step 2 of the United States Medical Licensing Examination or the equivalent of such step of any other board-approved medical licensing examination within the three-year period immediately preceding application for licensure as an assistant physician, or within three years after graduation from a medical college or osteopathic medical college, whichever is later;

(c) Has not completed an approved postgraduate residency and has successfully completed Step 2 of the United States Medical Licensing Examination or the equivalent of such step of any other board-approved medical licensing examination within the immediately preceding three-year period unless when such three-year anniversary occurred he or she was serving as a resident physician in an accredited residency in the United States and continued to do so within thirty days prior to application for licensure as an assistant physician; and

(d) Has proficiency in the English language.

Mo. Rev. Stat. § 334.036.1(1).

    5.    In order to legally provide medical services in Missouri, an AP must enter into a "collaborative practice arrangement," or "CPA." Mo. Rev. Stat. § 334.036.4. A CPA is an agreement between an AP and a physician that sets forth restrictions on the AP's ability to provide medical services and imposes supervisory duties on the physician, who is sometimes referred to as the "collaborating" physician or the "collaborator." Mo. Rev. Stat. §§ 334.036.1(2), 334.037.

2

6.	Under Missouri law, the "collaborating physician is responsible at all times for the oversight of the activities of and accepts responsibility for primary care services rendered by the [AP]." Mo. Rev. Stat. § 334.036.5. Further, APs may only practice pursuant to CPAs that limit the AP to providing only primary care services and only in medically underserved rural or urban areas in Missouri, or in any pilot project areas established in which APs may practice. Mo. Rev. Stat. § 334.036.2.

7.	CPAs must be in writing and must contain, among other things: the names and addresses of the AP and collaborating physician; a list of all locations where the collaborating physician has authorized the AP to prescribe; all specialty or board certifications of the collaborating physician and all certifications of the AP; a description of the AP's controlled substance prescribing authority in collaboration with the collaborating physician; the duration of the CPA between the collaborating physician and the AP; a description of the time and manner of the collaborating physician's review of the AP's delivery of health care services, including a provision that the AP shall submit a minimum of ten percent of the charts documenting the AP's delivery of health care services to the collaborating physician for review every fourteen days; and the "manner of collaboration" between the collaborating physician and the AP, including how the collaborating physician and the AP will maintain geographic proximity. Mo. Rev. Stat. § 334.037.1-2.

8.	The collaborating physician may not be so geographically distanced from the AP "as to create an impediment to effective collaboration in the delivery of health care services or the adequate review of those services," and, in cases of the diagnosis and initiation of treatment for acutely or chronically ill or injured persons, the collaborating physician shall be no more than 75

3

miles away from the AP. 20 C.S.R. § 2150-2.240(1)(A)-(B).

9. At any given time, a collaborating physician may not enter into more than a total of six CPAs—whether those CPAs are entered into with full-time APs, full-time advance practice registered nurses (sometimes referred to as nurse practitioners), full-time physician assistants, or any combination thereof. Mo. Rev. Stat. § 334.037.6; 20 C.S.R. § 2150-2.240(1)(E).

10. Special rules apply when an AP practices under a CPA at a location when the collaborating physician is not "continuously present." Mo. Rev. Stat. § 334.037.7. "Continuously present" means that "the supervising physician is physically present and seeing each and every patient with the [AP] when said AP is seeing and/or treating a patient." 20 C.S.R. § 2150-2.240(1)(D). Before an AP may practice under a CPA at a location where the collaborating physician is not continuously present, the collaborating physician must "determine and document the completion of at least a one-month period of time during which the [AP] shall practice with the collaborating physician continuously present . . . ." Mo. Rev. Stat. § 334.037.7; 20 C.S.R. § 2150-2.240(1)(C). In this context, a one-month period of time is equivalent to "a minimum of one hundred twenty (120) hours of clinic time, where the supervising physician and [AP] are seeing and treating patients." 20 C.S.R. § 2150-2.240(1)(D).

11. The Missouri Board of Registration for the Healing Arts (MBRHA) is the state regulatory agency that oversees compliance with the licensure procedures and supervision guidelines pertaining to assistant physicians. Mo. Rev. Stat. §§ 334.036.3(1), 334.037.3.

12. An AP wishing to be licensed as such in Missouri must submit an application to the MBRHA. The application includes, among other things, an Assistant Physician Verification of Collaborative Practice Arrangement form (CPA Verification Form). The CPA Verification Form

requires the collaborating physician and the AP to be identified by name and address. The CPA Verification Form further requires the collaborating physician to sign a certification statement that contains the following acknowledgements:

> I will be supervising the above named assistant physician for the delivery of health care services within the assistant physician's scope of practice and consistent within each collaborating professional's skill, training, and competence and the skill training of myself. (334.037.1 and 334.037.2(5)(a))
>
> I understand I am responsible at all times for the oversight of the activities of and accept responsibility for primary care services rendered by the assistant physician. (334.036.5)
>
> I understand the collaborative practice agreement shall meet the requirements set forth in 334.037 and 20 CSR 2150-2.240 such as maintaining geographical proximity, reviewing charts and delegating controlled-substance prescriptive authority.
>
> I understand the collaborative practice agreement shall limit the assistant physician to providing only primary care services and only in medically underserved rural or urban areas of this state or in any pilot project areas established in which assistant may practice; (334.036.2)
>
> I will notify the [MBRHA] of any change or termination of a collaborative practice arrangement within fifteen (15) days of such occurrence; **and** (20 CSR 2150-2.250(1)
>
> I have reviewed this document with the above named assistant physician and have reviewed the Statutes, Rules and Regulations that govern the practice of assistant physicians in the State of Missouri, including but not limited to 334.036 -334.038 and 20 CSR 2150-2.200 - 20 CSR 2150-2.260.

### C. The Medicare Program

13.     The United States Department of Health and Human Services, through the Centers for Medicare & Medicaid Services (CMS), administers the Medicare program, which is a federal health benefit program within the meaning of 18 U.S.C. § 24(b) that affects interstate commerce and provides the elderly and disabled with medical benefits, items, and services.

14.     Benefits are administered through different parts of the Medicare program, referred

to as Part A, Part B, Part C, and Part D, which relate to different services provided through the Medicare program.

15. Medicare Part B reimburses health care providers for covered health care services provided to Medicare beneficiaries in outpatient settings. CMS administers Medicare Part B through its statutory fiscal agents, called Medicare Administrative Contractors or "MACs." The MACs are private entities that review claims and make payments to providers for services rendered to Medicare beneficiaries. The MACs are responsible for processing Medicare claims arising within their assigned geographic areas, including determining whether the claim is for a covered service. Wisconsin Physicians Service Insurance Corporation ("WPS") is the Part B MAC for Eastern Missouri and thus processes reimbursement claims that Dr. Saggar—as an individual or through his businesses—submitted to Medicare.

16. To receive Medicare Part B reimbursement, providers must make appropriate application to the MAC and execute a written provider agreement. The provider agreement obligates the provider to know, understand, and follow all Medicare regulations and rules. After successful completion of the application process, the MAC assigns the provider a unique provider number, which is a necessary identifier for billing purposes.

17. Medicare Part B does not pay for services provided by an AP, except for in limited circumstances not applicable to this case. 42 C.F.R. §§ 415.170, 415.172, 415.174.

18. Dr. Saggar has been an enrolled Medicare provider since at least December 1, 2009. On or about January 24, 2020, Dr. Saggar signed a Medicare application as an official for SLGH requesting to become a Medicare provider. Contained in the application was Section 14, entitled "Penalties for Falsifying Information," which informed Dr. Saggar that he could be criminally

prosecuted (a) for executing or attempting to execute a health care fraud scheme or using false or fraudulent statements or representations to obtain money from a health care benefit program or (b) making or using false or fraudulent statements or representations in connection with the delivery or payment for health care benefits, items, or services. As part of the application, Dr. Saggar signed the "Certification Statement" of the application and thereby certified:

> I have read and understand the Penalties for Falsifying Information, as printed in the application. I understand that any deliberate omission, misrepresentation, or falsification of any information . . . contained in any communication supplying information to Medicare . . . [may be criminally prosecuted].
>
> I agree to abide by the Medicare laws, regulations and program instructions . . . including the Federal anti-kickback statute . . .
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

SLGH's provider number was approved and became effective on or about January 1, 2020.

### D. The Medicaid Program

19.     MO HealthNet administers the Missouri Medicaid program, which is jointly funded by the State of Missouri and, through CMS, the federal government. Missouri Medicaid is a health care benefit program within the meaning of 18 U.S.C. § 24(b) that affects interstate commerce and provides low-income citizens of Missouri with medical benefits, items, and services.

20.     The Missouri Medicaid Audit and Compliance Unit (MMAC) is a subpart of the Missouri Medicaid program that detects and prevents fraud, waste, and abuse, and recovers improperly expended Medicaid funds.

21.     A Medicaid provider must enter into a written agreement with MO HealthNet to receive reimbursement for medical services to Medicaid recipients and must agree to abide by MO

HealthNet's regulations in rendering and billing for those services.

22. Medicaid pays for certain types of primary care-related services provided by an AP if: (1) the AP has a CPA in writing with a licensed physician as required by Mo. Rev. Stat. § 334.037; and (2) the AP is licensed by the MBRHA.

23. Dr. Saggar has been a Medicaid provider since at least July 1, 2005. On or about February 22, 2021, Dr. Saggar signed a Medicaid application as the authorized representative of SLGH. As part of the application, Dr. Saggar certified that he would comply with all Missouri Medicaid program rules and regulations.

## COUNT 1
## Conspiracy
## 18 U.S.C. § 371

24. The above allegations are incorporated by reference as if fully set out herein.

25. Beginning in or about September 2017, and continuing to at least in or about July 2023, in St. Louis, Missouri, in the Eastern District of Missouri and elsewhere, the defendants,

SONNY SAGGAR, M.D., and
RENITA BARRINGER,

and persons known and unknown to the Grand Jury, including Co-Conspirator No. 1, did unlawfully, willfully, and knowingly combine, conspire, and agree with persons known and unknown to the Grand Jury to make false statements related to health care matters, in violation of 18 U.S.C. § 1035.

### A. Purpose of the Conspiracy

26. Dr. Saggar and Barringer, and others known and unknown to the Grand Jury, including Co-Conspirator No. 1, conspired to make false and fraudulent representations to

8

Medicare and Medicaid regarding health care services provided at SLGH in order to make money and profit.

### B. Manner and Means of the Conspiracy

27. The manner and means employed by Dr. Saggar and Barringer and others to effect the object of the conspiracy were as follows:

28. At all relevant times, Dr. Saggar and Barringer employed numerous APs through SLGH. Dr. Saggar advertised SLGH as both an urgent care and primary care clinic designed to reduce emergency room visits and associated costs, as well as a "residency prep" program for APs. Dr. Saggar publicly promoted SLGH—through its internet website and various media outlets—as a "stepping stone" for medical school graduates who have been unable to secure a residency and thus are ineligible to obtain a standard license to practice medicine. At least 39 APs have worked at the Downtown Location and/or the Creve Coeur Location of SLGH since January 2018.

29. Dr. Saggar, Barringer, and Co-Conspirator No. 1 caused Medicare to be billed for services at both SLGH locations as if they were provided by Dr. Saggar, when in fact, those services were provided by APs. It was also part of the conspiracy that Dr. Saggar, Barringer, and Co-Conspirator No. 1 caused Missouri Medicaid to be billed for services at both SLGH locations as if they were conducted by Dr. Saggar, when in fact they were conducted by APs without a valid CPA in place.

30. Dr. Saggar and Barringer recruited and offered stipends to physicians to induce them to sign up to be collaborating physicians for APs at SLGH. Dr. Saggar and Barringer falsely told those physicians that they merely needed to sign blank, undated CPA Verification Forms in order to fulfill their roles as collaborating physicians.

31. Dr. Saggar and Barringer used these pre-signed CPA Verifications Forms to falsely represent to the MBRHA that SLGH's APs had CPAs in place, even though, as Dr. Saggar and Barringer knew, no CPA existed between the AP and the purportedly collaborating physician.

32. As a result of Dr. Saggar and Barringer's actions, the APs often never met and did not receive any training from their purported collaborating physicians, as required by 20 C.S.R. § 2150-2.240(1)(C)-(D). Contrary to the legal requirements regarding the use of APs, a collaborating physician was not continuously present at SLGH, and that APs were instructed to see patients without a collaborating physician present, even though they had not received the required 120 hours of clinic time during which the collaborating physician and the AP were required to see and treat patients together.

33. Dr. Saggar and Barringer both (1) encouraged APs at SLGH to consult with each other regarding medical questions and (2) discouraged APs from seeking training and supervision from their purported assigned collaborating physicians.

34. Dr. Saggar, Barringer, and Co-Conspirator No. 1 caused Medicaid to be billed for services conducted by APs at the Creve Coeur Location even though, at all relevant times, the Creve Coeur Location was not a medically underserved rural or urban area. Thus, APs were entirely ineligible for CPAs to practice at that location, and Medicaid, in turn, would not have paid claims for services conducted at the Creve Coeur Location had it known that APs had performed the services.

35. From the inception of SLGH until on or about August 17, 2022, Barringer submitted all SLGH claims billed to Medicaid listing Dr. Saggar as the rendering provider, even though services were rendered by APs without CPAs or adequate supervision in place.

36. In addition, regarding Medicare, from at least as early as on or about January 2, 2020 until on or about May 15, 2023, Barringer submitted all SLGH claims billed to Medicare listing Dr. Saggar as the rendering provider, even though Medicare does not pay for services rendered by APs (except in limited circumstances not applicable to the conduct addressed in this indictment).

37. It was further part of the conspiracy that Dr. Saggar, Barringer, and Co-Conspirator No. 1 caused SLGH claims to be billed to Medicare and Missouri Medicaid that falsely indicated Dr. Saggar was the performing provider, even during times when Dr. Saggar was out of town, including during times when he was abroad.

38. It was further part of the conspiracy that, in or about January 2022, Dr. Saggar hired Co-Conspirator No. 1 to be the sole collaborating physician at the Creve Coeur Location. Co-Conspirator No. 1 is presently under a federal criminal indictment in the Eastern District of Missouri in another case. As a result of that indictment, the MMAC suspended Co-Conspirator No. 1's previously-existing Medicaid billing privileges in a February 27, 2020 letter sent to Co-Conspirator No. 1, which stated in relevant part that the MMAC was

> suspending your participation in the Missouri Medicaid ("MO HealthNet") program effective 30 days from the date of this letter or its delivery, whichever occurs first until a final legal decision is rendered. This suspension will result in [MO HealthNet Division] prohibiting you from submitting any further claims and/or from receiving payment for services provided to [MO HealthNet Division] participants individually or through any clinic, association, corporation, partnership, or other affiliate, during the period of time that your provider number is suspended.
>
> . . .
>
> Note that the suspension of your [MO HealthNet Division] provider number includes no longer providing services to [MO HealthNet Division] participants enrolled with [MO HealthNet Division] managed care health plans. You may not participate in [MO HealthNet Division] managed care health plans and, therefore, may not be reimbursed by [MO HealthNet Division] managed care health plans during the period of time your provider number is suspended. It is your obligation

to inform [MO HealthNet Division] managed care health plans with whom you contract of this action.

39. Following the suspension of his Medicaid billing privileges, Co-Conspirator No. 1 saw and treated Medicaid patients at the Creve Coeur Location even though, as he knew, he was prohibited from billing Medicaid. It further part of the conspiracy that Dr. Saggar, Barringer, and Co-Conspirator No. 1 concealed from Medicaid that Co-Conspirator No. 1 was performing services at the Creve Coeur Location by naming Dr. Saggar, rather than Co-Conspirator No. 1, as the rendering provider in the claims for payment.

### C. Overt Acts

40. In furtherance of the conspiracy, and to effectuate the purpose of the conspiracy, the defendants and others committed and caused to be committed the following over acts, among others:

   a. On or about October 29, 2019, Dr. Saggar emailed physician L.H. asking L.H. if L.H. would be willing to serve as a collaborating physician for SLGH. In the email, Dr. Saggar offered a "stipend of $480/month ($80/mid-level/month) for up to 6 mid-levels." When L.H. asked what the collaborating physician was required to do, Dr. Saggar stated, "Nothing. Except sign the form that agrees to be the [collaborating physician], once a year. The State just needs to assign the mid-levels to a [collaborating physician]."

   b. On or about December 4, 2019, Barringer emailed L.H. and attached the blank CPA Verification Form. In the email, Barringer instructed L.H. to print six copies of the CPA Verification Form, and to sign them but not date them.

   c. On or about March 16, 2023, Co-Conspirator No. 1 submitted an application to enroll in Missouri Medicaid and, in the application, falsely certified:

> I hereby certify that all of the information provided on this application is true and correct, and that the enrolling provider is in compliance with all applicable federal and state laws and regulations. I further certify that neither I, nor any of the enrolling providers, employees, partners, officers, or shareholders owning at least five percent (5%) of said provider are currently barred, suspended, terminated, voluntarily withdrawn as part of a settlement agreement, or otherwise excluded from participation in the Medicaid or Medicare programs, nor are any of the above currently under sanction for, or serving a sentence for conviction of any Medicaid or Medicare program violations.

        d.      Each of the allegations set forth in Counts 2 through 9 is incorporated and realleged as though restated herein, as an individual over act done in furtherance of the conspiracy.

All in violation of 18 U.S.C. § 371.

### COUNTS 2 THROUGH 9
### False Statements Related to Health Care Matters
### 18 U.S.C. §§ 1035 and 2

41.    The above allegations are incorporated by reference as if fully set out herein.

42.    On or about the dates listed below, in St. Louis, Missouri, in the Eastern Division of the Eastern District of Missouri and elsewhere, the defendants,

                  SONNY SAGGAR, M.D., and
                  RENITA BARRINGER,

aided and abetted by, and aiding and abetting, Co-Conspirator No. 1 and others known and unknown to the Grand Jury, knowingly and willfully made and used materially false writings and documents, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services involving the Medicare and Missouri Medicaid programs, which are health care benefit programs as defined in 18 U.S.C. § 24(b), in violation of 18 U.S.C. § 1035, in that the defendants falsely stated and represented in claims for payment that services were rendered by Dr. Saggar when, in fact, they were rendered by individuals whose services were not reimbursable by the Medicare and

Missouri Medicaid programs, when the defendants then and there well knew said statements and representations were false, fictitious, and fraudulent, as follows:

| Count | Date of Service | Patient Initials | Insurance | Rendering Physician According to Claim | Place of Service | Service Billed | Date Paid | Amount Paid |
|---|---|---|---|---|---|---|---|---|
| 2 | 7/25/2022 | G.M. | Medicare | Saggar, Sonny | Creve Coeur Location | 99214 - Office Visit | 9/10/2022 | $100.26 |
| 3 | 7/25/2022 | G.M. | Medicaid | Saggar, Sonny | Creve Coeur Location | 99214 - Office Visit | 9/23/2022 | $25.58 |
| 4 | 7/18/2022 | P.L. | Medicare | Saggar, Sonny | Creve Coeur Location | 99204 - New Visit | 8/12/2022 | $130.88 |
| 5 | 7/25/2022 | L.R. | Medicare | Saggar, Sonny | Creve Coeur Location | 99214 - Office Visit | 8/18/2022 | $100.26 |
| 6 | 11/21/2021 | C.D. | Medicare | Saggar, Sonny | Downtown Location | 99214 - Office Visit | 12/29/2021 | $103.38 |
| 7 | 1/18/2022 | L.P. | Medicare | Saggar, Sonny | Downtown Location | 99211 - Office Visit | 11/4/2022 | $23.09 |
| 8 | 1/18/2022 | T.E. | Medicare | Saggar, Sonny | Downtown Location | Urine Test | 3/3/2022 | $8.61 |
| 9 | 6/23/2019 | L.B. | Medicaid | Saggar, Sonny | Downtown Location | 99214 - Office Visit | 7/12/2019 | $57.20 |

All in violation of 18 U.S.C. §§ 1035(a)(2) and 2.

### FORFEITURE ALLEGATION

The Grand Jury further finds by probable cause that:

1. Pursuant to Title 18, United States Code, Sections 982(a)(7), upon conviction of an offense in violation of Title 18, United States Code, Section 1035 as set forth in Counts 1 through 10, the defendants shall forfeit to the United States of America any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of said offense(s).

2. Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offense(s).

3. If any of the property described above, as a result of any act or omission of the defendants:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL.

_____
FOREPERSON

SAYLER A. FLEMING
United States Attorney

_____
AMY E. SESTRIC, #66219MO
Assistant United States Attorney