UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 4:23-CR-380 |
| SONNY SAGGAR, M.D., and RENITA BARRINGER, | ) |
| Defendants. | ) |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS INDICTMENT BASED ON THE COURT'S LACK OF JURISDICTION**

First, to address the elephant in the room, this motion will not result in the freeing of thousands of felons across this country. "Under *Teague* v. *Lane*, newly recognized rules of criminal procedure do not normally apply in collateral review." *Ramos v. Louisiana*, 140 S. Ct. 1390, 1406–07 (2020). The *Ramos* Court went on, "[t]rue, *Teague* left open the possibility of an exception for 'watershed rules' 'implicat[ing] the fundamental fairness [and accuracy] of the trial.'" *Id*. Then more recently, the Supreme Court again stated, "[t]his Court has repeatedly stated that a decision announcing a new rule of criminal procedure ordinarily does not apply retroactively on federal collateral review," *Edwards v. Vannoy*, 141 S. Ct. 1547, 1551–52 (2021), and went on to hold, "[i]t is time—probably long past time—to make explicit what has become increasingly apparent to bench and bar over the last 32 years: New procedural rules do not apply retroactively on federal collateral review. The watershed exception is moribund." *Id*., at 1560. Consequently, any fear that a decision in this case will have an overwhelming retroactive application is unfounded.

With that concern out of the way, the question is simple – what was the founding-era meaning of the right to a Grand Jury as guaranteed under the Fifth Amendment to our Constitution?

1

As the Supreme Court said, "the Constitution's guarantees cannot mean less today than they did the day they were adopted." *United States v. Haymond*, 139 S. Ct. 2369, 2376 (2019). "The Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted, it means now." *South Carolina v. United States,* 199 U.S. 437, 448 (1905). Most certainly, the Grand Jury envisioned by our Founding Framers was never one where "it may often be true that 'a grand jury might indict a ham sandwich' if asked to do so by a prosecutor." *United States v. Cahill*, 2022 WL 10394481, at *6 (S.D.N.Y. Oct. 18, 2022). Such a modern day image of the Grand Jury is a blackeye on the entire criminal justice system, particularly when, as the Supreme Court has recognized, an indictment does "more than commence a criminal proceeding (with all the economic, reputational, and personal harm that entails); the determination may also serve the purpose of immediately depriving the accused of her freedom." *Kaley v. United States*, 571 U.S. 320, 329 (2014). It should be indisputable that "economic, reputational, and personal harm," along with loss of freedom (and/or the burdens of bond conditions) are too significant to treat individuals no better than "ham sandwiches."

As set forth in Defendants' opening memorandum, Supreme Court Justice Wilson, a Founding Father, and according to the Supreme Court, someone "who may be assumed to have known the current practice," told grand juries that mere probabilities was not acceptable.[1] Supreme Court Justice Field, whose grand jury charge, according to the Supreme Court, could not have "better illustrated" the importance of the grand jury, said, "you ought not to find an indictment, unless in your judgment, the evidence before you, unexplained and uncontradicted, *would warrant a conviction by a petit jury*."[2] Likewise, Chief Justice, Robert Taney charged the grand jury that they must find "the evidence before you is *sufficient*, in the absence of any other proof, *to justify*

---

[1] See, Doc. 49 at 4.
[2] See, Doc. 49 at 5.

2

*the conviction of the party accused*."[3] Moreover, William Blackstone, whom the Supreme Court identified as "the preeminent authority on English law for the founding generation," asserted grand juries "ought to be thoroughly persuaded of the truth of an indictment."[4]

Multiple scholars who have studied the grand jury history circa 1791 all found a standard of proof greater than probable cause. Mr. Ortman, who reviewed every surviving grand jury charge given by American judges prior to 1801, concluded that a standard higher than probable cause dominated the courts circa 1791.[5] Likewise, Thomas Y. Davies, Professor of Law, University of Tennessee Knoxville College of Law, in *The Fictional Character of Law-and-Order Originalism*, 37 Wake Forest L. Rev. 239, 427–28 (2002), channeling Blackstone, wrote "at common law, grand jurors were usually instructed not to indict unless they were persuaded, based on the prosecutor's evidence, of the 'truth' of the accusation." And, Niki Kuckes, Professor of Law, Williams University School of Law, *"Retelling Grand Jury History"* published in Grand Jury 2.0: Modern Perspectives on the Grand Jury (Roger Anthony Fairfax, Jr. ed. 2011), wrote, "the historic tradition of hearing only the prosecutor's evidence went hand-in-hand with, and was integral to, **a far higher evidentiary standard than the modem test of probable cause**. . . . [T]he grand jury only heard from the prosecutor; but the grand jury rigorously evaluated the prosecutor's evidence **using a standard akin to the trial jury's reasonable doubt standard**." *Id*., at 143-146 (emphasis added).

And significantly, on multiple occasions, even the Government has previously acknowledged to the Supreme Court that Blackstone and other historical writers suggested a standard higher than probable cause:

> There are, it is true, occasional observations to the effect that since the accused has no chance to present evidence to the grand jury, **the "proof of the offence should be substantial"** (2 Hawkins, *Pleas of the Crown,* 367), and that a "grand jury * * * ought to

---

[3] See, Doc. 49, at 5-6.
[4] See, Doc. 49 at 9-10.
[5] See, Doc. 49 at 7-9.

**be thoroughly persuaded of the truth of an indictment**, so far as their evidence goes; and not rest satisfied merely with remote probabilities: a doctrine that might be applied to very oppressive purposes." 4 Blackstone, *Commentaries* (Chitty, 1866), 247. And see 1 Chitty, *Criminal Law* (1847 Ed.) 318-319. (emphasis added)

*Costello v. U.S.,* 1955 WL 72457 , 21 (U.S., 2006)(Brief for the United States).[6]

Juxtaposed to that compelling history, just a few months ago, the Department of Justice, through its primary spokesperson, the U.S. Solicitor General, told the Supreme Court, "[b]ecause 'constitutional rights are enshrined with the scope they were understood to have when the people adopted them,' a court should also consider evidence of how the Founding generation understood the right." *United States v. Rahimi*, 2023 WL 5322645 (U.S.), 13 (Brief for the United States). And in another pleading, the Solicitor General likewise asserted, "[t]here is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor." *United States v. Resendiz-Ponce,* 2006 WL 1794485 (U.S.), 28 (Brief for the United States). **Yet, the Government's response here offers the Court no evidence whatsoever relating to how the "Founding generation understood" the right to only be indicted by a Grand Jury.**

Indisputably, "[i]n recent years, this Court . . . [i]ncreasingly, has emphasized original meaning in constitutional interpretation." *Haaland v. Brackeen*, 599 U.S. 255 (2023)(J. Gorsuch concurring, joined by J. Sotomayor and J. Jackson). "[I]t has become a tired trope to criticize any reference to the Constitution's original meaning as (somehow) both radical and antiquated. Seeking

---

[6] *See also*, *United States v. Resendiz-Ponce*, 2006 WL 1794485 (U.S.), 28-29(Brief for the United States)(emphasis added)("Blackstone wrote that the function of the grand jury was to determine "whether there be sufficient cause to call upon the party to answer [the accusation]," and added **that "[a] grand jury *** ought to be thoroughly persuaded of the truth of an indictment so far as their evidence goes, and not to rest satisfied merely with remote probabilities." 4 William Blackstone, *Commentaries on the Laws of England* *303.");** *U.S. v. Williams*, 1991 WL 521337 (U.S.), 13 n.3 (Brief for the United States)(1991)("Blackstone added that the grand jury should not issue indictments based on 'remote possibilities,' **but should be persuaded of their truth** 'so far as their evidence goes.'")(emphasis added).

4

to understand the Constitution's original meaning is part of our job." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.,* 141 S. Ct. 1017, 1039 n. 5 (2021)(Gorsuch and Thomas concurring).

As the above-quoted Solicitor General briefs indicate, the Government agrees that, "Constitutional rights are enshrined with the scope they were understood to have ***when the people adopted them***." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111, 2136, 2137 (2022). But the Government's response completely ignores the volume of historical evidence circa 1791 Defendants offered, and offers none of its own. Instead, the Government cites two Supreme Court cases, one from 1887, and one from 1884. However, both of those cases are almost 100 years after the adoption of the Fifth Amendment. No one from the founding-era was even alive then.

It is true, 100 years and more after the adoption of the Fifth Amendment, the Supreme Court, without any analysis, assumed the grand jury standard of proof was probable cause. But, regarding standard of proof, none of the Government's cited cases looked at "the public understanding of the right *when the Bill of Rights was adopted in 1791,*" and "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, 142 S. Ct. at 2137. "The Constitution demands more than the continued use of flawed criminal procedures." *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020)(J. Sotomayor concurring).

A.     **The Government Offers Nothing But Dicta.**

The Government criticizes Defendants' position that later Courts merely assumed probable cause was the grand jury standard. But, as discussed below, the Government fails to cite any cases questioning the grand jury standard of proof. Not once has the Supreme Court been asked to rule on the appropriate standard. Rather, it was simply assumed within *dicta*.

"[B]road language unnecessary to the Court's decision cannot be considered binding authority." *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.,* 551 U.S. 449, 476 (2007). "Dictum settles nothing, even in the court that utters it." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 352 n.13 (2005). "[E]ven repeated dicta does not constitute precedent." *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2498 (2022). As the Eighth Circuit recently made clear, "[a]lthough we give Supreme Court dicta more weight than other judicial dicta as a prophecy of what the Court might hold, it is not binding." *Dahle v. Kijakazi*, 62 F.4th 424, 428 (8th Cir. 2023).[7] Here, given the recent commitment of the Supreme Court to originalism, the dicta cited by the Government is entitled to even less weight "as a prophecy."

To determine what is dicta, the Supreme Court has repeated stated, "we are not bound to follow our dicta in a prior case **in which the point now at issue was not fully debated**." *Cent. Virginia Cmty. Coll. v. Katz,* 546 U.S. 356, 363 (2006)(emphasis added); *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,* 551 U.S. 701, 737 (2007)(same). When the Court has "never squarely addressed the issue, and [has] at most assumed the [legal conclusion], we are free to address the issue on the merits." *Brecht v. Abrahamson*, 507 U.S. 619, 630–31 (1993).

Here, not a single case cited by the Government addressed the actual question of what is the proper grand jury standard of proof – in other words, "**the point now at issue was not fully debated**." Others who have studied the question closely have concluded that "[t]here is no

---

[7]*See also*, *New Doe Child #1 v. United States,* 901 F.3d 1015, 1019 (8th Cir. 2018)("While undoubtedly important to our analysis, Supreme Court *dicta* does not dictate the outcome of this case. This court, sitting *en banc*, recently clarified the role of Supreme Court *dicta* in our decisionmaking: "Although panels have held that federal courts are 'bound' by Supreme Court dicta, this goes too far. . . . Thus, like our sister circuits, we respectfully consider the Supreme Court's statements on this issue, but we do not stop our analysis there.")

Supreme Court decision announcing that the standard for indictment shall henceforth be 'probable cause.'" Niki Kuckes, *"Retelling Grand Jury History,"supra.*

"Dicta is '[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential[.]'" *Sanzone v. Mercy Health*, 954 F.3d 1031, 1039 (8th Cir. 2020). "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925). The Government does not cite a single case where the grand jury standard of proof was ever questioned.

An example may best illustrate the identification of dicta. In *Payton v. New York*, 445 U.S. 573, 587 (1980), the Court said, "[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, **assuming that there is probable cause to associate the property with criminal activity.**" (emphasis added). Seven years later, the Court made clear that such a statement was merely dicta. "We have not ruled on the question whether probable cause is required in order to invoke the "plain view" doctrine. Dicta in *Payton v. New York,* 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980), suggested that the standard of probable cause must be met." *Arizona v. Hicks*, 480 U.S. 321, 326 (1987).[8] Likewise, the Supreme Court has never ruled (and never been asked to rule) that probable cause is the grand jury standard of proof.

---

[8] As another example, see also, *United States v. Hensley*, 469 U.S. 221, 227–28 (1985):
> To the extent previous opinions have addressed the issue at all, they have suggested that some investigative stops based on a reasonable suspicion of past criminal activity could withstand Fourth Amendment scrutiny. Thus *United States v. Cortez, . . .* indicates in a footnote that "[o]f course, an officer may stop and question a person if there are reasonable grounds to believe that person is wanted for past criminal conduct." And in *United States v. Place, . . .* decided barely a month before the Sixth Circuit's opinion, this Court stated that its prior opinions acknowledged police authority to stop a person "when the officer has reasonable, articulable suspicion that the person *has been,* is, or is about to be engaged in criminal activity." . . . Indeed, *Florida v. Royer* itself  suggests that certain seizures are justifiable under the Fourth Amendment even in the absence of probable cause "if there is articulable suspicion that a person *has committed* or is about to commit a crime." . . .

7

The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

*Humphrey's Ex'r v. United States*, 295 U.S. 602, 627 (1935)(quoting, Chief Justice Marshall in *Cohens v. Virginia*, 6 Wheat, 264, 399, 5 L.Ed. 257).

Looking at each case cited by the Government as "precedent," none of them involved a question about the proper standard of proof for the grand jury. None looked at whether the lowest standard (probable cause) or some higher standard was appropriate. Each assumed, without any discussion, that the standard was probable cause. For none of the cases was a determination of the applicable standard of proof necessary to the court's decision.

1) *Branzburg v. Hayes*, 408 U.S. 665 (1972) held that requiring newsmen to appear and testify before state or federal grand juries does not abridge the freedom of speech and press guaranteed by the First Amendment. There was no debate or argument regarding grand jury standard of proof.
2) *Ex parte U.S.,* 287 U.S. 241 (1932), held where indictment by grand jury is fair on its face, the court, on application, should issue warrant for arrest of accused as matter of course and that the Supreme Court could issue a writ of mandamus. There was no debate or argument regarding grand jury standard of proof.
3) *Gerstein v. Pugh*, 420 U.S. 103 (1975) did not involve the Fifth Amendment at all but only questions involving the Fourth Amendment. There was no debate or argument regarding grand jury standard of proof.
4) *Kaley v. United States*, 571 U.S. 320 (2014) held that defendants were not entitled to challenge grand jury's probable cause determination at pre-trial post-restraint hearing, but there again was no debate or argument regarding grand jury standard of proof.
5) *United States v. Calandra*, 414 U.S. 338 (1974) held that a witness summoned to appear and testify before the grand jury may not refuse to answer questions on the ground that they are based on evidence obtained from unlawful search and seizure. There was no debate or argument regarding grand jury standard of proof.
6) *Costello v. United States*, 350 U.S. 359 (1956) held that a defendant could be required to stand trial and a conviction could be sustained even if only hearsay evidence was presented to the grand jury which indicted him. There was no debate or argument regarding grand jury standard of proof.

---

**At the least, these dicta suggest that the police are not automatically shorn of authority** to stop a suspect in the absence of probable cause merely because the criminal has completed his crime and escaped from the scene.(emphasis added).

7) *Hurtado v. People of State of Cal.,* 110 U.S. 516 (1884) held the words "due process of law," in the fourteenth amendment of the constitution of the United States, do not necessarily require an indictment by a grand jury in a prosecution by a state for murder. There was no debate or argument regarding grand jury standard of proof.
8) *United States v. Smith*, 27 F. Cas. 1186, 1187 (C.C.D.N.Y. 1806)provides no support first because it is out of the District of New York and cannot control this Court, and second the quote cited by the Government, is actually merely the court stating the prosecutor's position.

Importantly, the Government has tacitly conceded that its "precedent" is actually all dicta. As this Court is likely aware, defense counsel also recently made the same lack of jurisdiction argument in another case in this District, *United States v. Carroll*, S1 4:21-CR-532, Doc. 220. After the Government filed its Response in *Carroll*, defense counsel filed its reply. *United States v. Carroll*, S1 4:21-CR-532, Doc. 224. That Reply fully addressed the issue of dicta and set out, just like above, how each of the same cases cited by the Government here contained mere dicta as to the grand jury standard of proof. Here, knowing that the Defendants' position would be that its case law is merely dicta, the Government simply filed a verbatim copy of what it had filed in *Carroll* and, as the Court can see, made no attempt to address the critical issue of dicta. The Government had nine days and ten extra pages in which it could have tried to refute the argument of dicta. The fact it did not is a clear message to the Court it does not have any retort.[9]

This Court is not bound by any of the Government's cited cases. To repeat, "even repeated dicta does not constitute precedent." *Castro-Huerta*, 142 S. Ct. at 2498, and the court is "not bound to follow our dicta in a prior case in which the point now at issue was not fully debated." *Cent. Virginia Cmty. Coll. v. Katz,* 546 U.S. at 363. The Government cannot point to a single case where the issue of grand jury standard of proof was fully debated and its argument that there is actual Supreme Court precedent is without substance.

---

[9] This was not an oversight. Government counsel in this matter is supervised by the Government counsel handling *Carroll,* and Government counsel in this matter even attended the hearing on this motion in *Carroll.*

9

Though *stare decisis* is not applicable here because there is no holding of precedential value (i.e., it is all dicta), the Supreme Court's comments regarding *stare decisis'* application to criminal procedure issues are telling. "The force of *stare decisis* is at its nadir in cases concerning criminal procedure rules that implicate fundamental constitutional protections." *Ramos, at* 1390 (J. Sotomayor concurring)(quoting *Alleyne v. United States*, 570 U.S. 99, 116 n. 5 (2013)). As the majority explained in *Ramos,* "the doctrine is 'at its weakest when we interpret the Constitution' because a mistaken judicial interpretation of that supreme law is often 'practically impossible' to correct through other means." *Id*., at 1405. Certainly, if *stare decisis* is at its lowest in application to criminal procedure, that can only be doubly true for dicta.

### B.   Circa 1791 Evidence All Reflects A Higher Standard Than Probable Cause.

The Government claims, "[r]egardless of how some courts might have instructed grand juries on a few occasions, the Supreme Court has long recognized only one standard for federal grand jury indictments—probable cause." Doc. 65 at 1-2. But, if that is the Government's starting point, then its argument is significantly and fatally flawed. As Defendants noted in their opening memorandum, then U.S. Supreme Court Justice James Wilson charged the first federal circuit grand jury to sit in Pennsylvania, stating in relevant part:

> The doctrine, that a grand jury may rest satisfied merely with probabilities, is a doctrine, dangerous as well as unfounded: It is a doctrine, which may be applied to countenance and promote the vilest and most oppressive purposes: It may be used, in pernicious rotation, as a snare, in which the innocent may be entrapped, and as a screen, under the cover of which the guilty may escape.[10]

---

[10] James Wilson, Charge to the Grand Jury of the Circuit Court for the District of Pennsylvania (April 12, 1790), *in* 2 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789-1800 (Maeva Marcus ed., 1988)

10

Because the Supreme Court identified Justice Wilson as someone "who may be assumed to have known the current practice," *Hale v. Henkel*, 201 U.S. 43, 61 (1906), it may be assumed that the then current practice (circa 1791) was not to rest merely on probabilities.

The Government also ignores Defendants' citation to Supreme Court Chief Justice Robert Taney's grand jury charge:

> You will, therefore, in every case that may come before you, carefully weigh the testimony, and present no one, unless, in your deliberate judgment, the evidence before you is *sufficient*, in the absence of any other proof, *to justify the conviction of the party accused*.

*Charge to Grand Jury*, 30 F. Cas. 998, 999 (C.C.D. Md. 1836)(emphasis added). Not only was Taney the then Chief Justice of the Supreme Court, he was previously the United States Attorney General (chief law enforcement officer of the nation) – yet he recognized a standard much higher than probable cause.

Even as late as 1872, then Supreme Court Justice Stephen J. Field instructed the grand jury:

> To justify the finding of an indictment, you must be convinced, so far as the evidence before you goes, that the accused is guilty; in other words, you ought not to find an indictment, unless in your judgment, the evidence before you, unexplained and uncontradicted, *would warrant a conviction by a petit jury*.

*In re Charge to Grand Jury*, 30 F. Cas. 992, 994, 2 Sawy. 667 (C.C.D. Cal. 1872). Rather than this being some one-off grand jury charge given "on a few occasions," these were charges supporting Defendants' position given by then sitting members of the Supreme Court. Moreover, one of the very cases the Government relies on spoke of the charge given by Justice Field: "The importance of the part played by the grand jury in England cannot be better illustrated than by the language of Justice FIELD, in a charge to a grand jury, reported in 2 Sawy. 667." *Ex parte Bain*, 121 U.S. 1, 10, (1887). Additionally, Justice Field's charge to the grand jury was cited in *Hale v. Henkel*, 201 U.S. 43, 63, and *Hurtado v. People of State of California*, 110 U.S. 516, 555, (1884). Finally, the

11

same charge was cited by the Solicitor General representing the United States. *U.S. v. Cotton*, 2002 WL 264766 (U.S.), 26 (Brief for the United States).

Rather than looking 100 years after the fact, the Supreme Court demands that in determining "original public meaning," courts must look to "**when the people adopted them**. . . . **when the Bill of Rights was adopted in 1791**." *Bruen,* 142 S. Ct. at 2136, 2137.[11]

The Government offers no response whatsoever to Defendants' multiple citations to William Blackstone,[12] notwithstanding the Supreme Court identified him as, "the preeminent authority on English law for the founding generation," *Alden v. Maine*, 527 U.S. 706, 715 (1999), who "described the prevailing practice in 18th century England." *United States v. Williams,* 504 U.S. 36, 51, (1992).[13] As the Court said in *United States v. Bolles*, 209 F. 682, 685 (W.D. Mo.

---

[11] *See also*, *Virginia v. Moore*, 553 U.S. 164, 168–169 (2008) (Fourth Amendment: "We look to the statutes and common law **of the founding era** to determine the norms that the Fourth Amendment was meant to preserve."); *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 376 (1996)("**when the Amendment was adopted**."); *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2428 (2022)("has to accord with history and faithfully reflect **the understanding of the Founding Fathers**."); *United States v. Jones,* 565 U.S. 400, 406 (2012)("we must 'assur[e] preservation of that degree of privacy against government that existed **when the Fourth Amendment was adopted**.'"); *Baltimore & Carolina Line v. Redman,* 295 U.S. 654, 657 (1935)("The right of trial by jury thus preserved is the right which existed under the English common law **when the amendment was adopted.**").

[12] John Marshall, the early influential Chief Justice is said to have read the *Commentaries* four times. D Nolan, 'Sir William Blackstone and the New American Republic: a Study of Intellectual Impact' (1976) 51 *New York University Law Review* 731, 757. According to Albert Alschuler, a thousand copies of the *Commentaries* had sold in the American colonies before the first of several American editions was published in 1772. A Alschuler, 'Rediscovering Blackstone' (1996) 145 *University of Pennsylvania Law Review* 1, 5. On a list of 1400 subscribers to the first American edition, Dennis Nolan found 16 signers of the Declaration of Independence, 6 delegates to the 1787 Constitutional Convention, a president (John Adams) and an early Chief Justice of the Supreme Court (John Jay). Nolan, D, 'Sir William Blackstone and the New American Republic: a Study of Intellectual Impact' (1976) 51 *N. Y. U. L. R.* 731, 743-44.

[13] *See, also, Schick v United States* 195 US 65, 69 (1904) ('Blackstone's Commentaries are accepted as the most satisfactory exposition of the common law of England. At the time of the adoption of the Federal Constitution, it had been published about twenty years, and it has been said that more copies of the work had been sold in this country than in England; so that undoubtedly, the framers of the Constitution were familiar with it'); *Brown v Entertainment Merchants Association* 131 S Ct 2729, 2757 (2011) ("Blackstone's Commentaries was 'a primary legal authority for 18th and 19th-century American lawyers."); *Green v. United States*, 356 U.S. 165, 186 (1958) ("a Congress with a Judiciary Committee including members of the recent Constitutional Convention, who no doubt shared the prevailing views in the American Colonies of English law as expressed in Blackstone.");*Green v United States* 355 US 184, 187 (1957) (Blackstone's Commentaries 'greatly influenced the generation that adopted the

12

1913), "[t]he statement made by Blackstone, who died in 1780, of the procedure before a grand jury, may be taken as a correct view of the procedure as it existed in his time."

Importantly, not only the Solicitor General, but the Supreme Court itself, in *Beavers v. Henkel,* 194 U.S. 73, 84 (1904), also quotes Blackstone's "thoroughly persuaded" language:

> A grand jury, however, ought to be **thoroughly persuaded of the truth** of an indictment, so far as their evidence goes; and not to rest satisfied merely with remote probabilities: a doctrine that might be applied to very oppressive purposes.' (emphasis added).

In fact, multiple judges in multiple different jurisdictions used portions or all of Blackstone's exact wording in their charges to grand juries, i.e., "ought to be thoroughly persuaded of the truth of an indictment, so far as their evidence goes; and not rest satisfied merely with remote probabilities."[14]

And, Blackstone was by no means an outlier in understanding the grand jury's proper standard of proof. Twenty-two years following adoption of the Amendment, in the first edition of Joseph Chitty's influential treatise, *Practical Treatise on the Criminal Law*, Chitty stated "great authorities have taken a more merciful view of the subject and . . . have argued that the grand inquest ought, as far as evidence before them goes, to be convinced of the guilt of the defendant." Joseph Chitty, 1 A PRACTICAL TREATISE ON THE CRIMINAL LAW 318 (Philadelphia 1816). Other noted authorities also included Sir John Somers, who addressed the issue in 1681 in

---

Constitution'); *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2132 (2022)( "A long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice.").

[14] *See, e.g., Gentlemen of the Grand Jury,* at 109 (Judge Houstoun's Charge, Chatham County, Georgia, January, 1792), at 570 (First Report of Judge Pickering's Charge to the Grand Jury, New Hampshire, September, 1790), at 726 (Judge George Turner, Northwest Territory, April 1794), at 1243 (Judge Thomas Waite, South Carolina, 1789); *Conniff v. Luzerne Cnty.*, 30 Pa. Super. 383, 385 (1906)("The measure of proof required to find a true bill is laid down by Blackstone (4 Comm. 303) as follows: 'In order to find a true bill a grand jury ought to be thoroughly persuaded of the truth of an indictment so far as their evidence goes; and not to rest satisfied merely on remote probabilities; a doctrine which might be applied to very oppressive purposes.'"); *Smith v. State*, 61 Miss. 754, 757 (1884)

his *Security of English-Men's Lives,* a popular pamphlet reprinted in America as late as 1773. Somers argued that a probability standard was far too low, given the importance of the grand jury's task. Instead, he argued that the grand jury must be "fully convinced" of the defendant's guilt to bring charges. Somers expressly rejected the view that the grand jury's charging standard should be no higher than the standard for arrest. See also, 1 H.C. Underhill, *A Treatise on the Law of Criminal Evidence* § 28, at 51 (1910)("The better and more modern rule, as stated by Blackstone, is that "a grand jury ought to be thoroughly persuaded of the truth of an indictment, so far as their evidence goes, and not rest satisfied with remote possibilities." In other words, the grand jury ought not to indict unless they are convinced that the accused is guilty and that the evidence before them is sufficient, if unexplained and uncontradicted, to convict him.").

As highlighted previously, in 2016, William Ortman, reviewed every surviving grand jury charge given by American judges prior to 1801. In his article, *Probable Cause Revisited,* 68 Stan. L. Rev. 511 (2016), he concluded, "a careful examination of these charges reveals that among the American judges of the Founding era who expressed a view, Justice Wilson's position--that grand juries should return an indictment only on an evidentiary showing *more demanding* than probable cause--dominated. *Id*., at 520. Additionally, he noted, that "[w]hile these formulations offer a range of certainty levels, they share a common theme: all go beyond, and often far beyond, the bare 'probable cause' criterion advanced by the English Tories." *Id.*, at 530-31(emphasis added). In conclusion, Ortman found that by the end of "the eighteenth century, the [higher than probable cause] view of the criminal charging standard seems settled," and "[the higher than probable cause] charging standard stood for about the first three-quarters of the nineteenth century. If anything, it grew more entrenched." *Id*. at 540.

  **C.**  **A Long-Standing Practice Which Ignores The First 100 Years Could Never Override What Was Clearly Intended Circa 1791.**

14

The Government argues its 100 year later cases show a "settled and established practice." Doc. 65 at 4. However, more recent Supreme Court decisions have shown the limited use that courts should make of "established practices." In *Bruen,* 142 S. Ct. at 2136, the Court stated, "where a governmental practice has been open, widespread, and unchallenged **since the early days of the Republic**, the practice should guide our interpretation of an ambiguous constitutional provision."(emphasis added). One hundred years later is not within the "early days of the Republic." As the *Bruen* Court went on to explain, "we must also guard against giving postenactment history more weight than it can rightly bear." *Id.* "[B]ecause post-Civil War discussions . . . 'took place 75 years after the ratification of the [ ]Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Id.*, at 2137. The Court continued, "late-19th-century evidence cannot provide much insight into the meaning of the [ ] Amendment when it contradicts earlier evidence." *Id.*, at 2154. The only historical evidence the Government has offered is late-19th century evidence which contradicts Defendants' circa 1791 evidence. But, again, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.,* at 2137. *See also, Espinoza v. Montana Dept. of Revenue*, 140 S.Ct. 2246, 2258-2259 (2020)(a practice that "arose in the second half of the 19th century ... cannot by itself establish an early American tradition" informing our understanding of the First Amendment.").

Significantly, in *Carroll,* defense counsel offered this same argument against "established practice," yet again, knowing it was coming, the Government has made no effort to refute it.

For the above reasons, the Indictment is a nullity and must be dismissed. Because this is a purely legal issue, to which the law weighs heavily for Defendants, Defendants will concur with the Government that no hearing is necessary for this motion.

Dated: November 14, 2023

Respectfully submitted,

**DOWD BENNETT LLP**

By: /s/ *James G. Martin*
James G. Martin  #33586 MO
James B. Martin  #70219 MO
7676 Forsyth Blvd., Suite 1900
St. Louis, MO  63105
314/889-7300 (Telephone)
314/863-2111 (Facsimile)
jmartin@dowdbennett.com
jbmartin@dowdbennett.com

*Attorneys for Defendant Sonny Saggar, M.D.*

/s/ William J. Ekiss
William J. Ekiss (#47389)
5770 Mexico Rd., Ste A
St. Peters, MO 63376
Email: billekiss@lampinlaw.com

*Attorneys for Defendant Renita Barringer*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on November 14, 2023, a copy of the foregoing was filed electronically via this Court's CM/ECF system, and therefore served on all parties of record.

/s/ *James G. Martin*
James G. Martin