**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | )  **Case No.  4:23-CR-380 SRC/PLC** |
| | ) |
| **SONNY SAGGAR, M.D.** | ) |
| **and** | ) |
| **RENITA BARRINGER,** | ) |
| | ) |
| **Defendants.** | ) |

### Report and Recommendation

This matter is before the Court on Defendants Sonny Saggar, M.D. and Renita Barringer's Motion to Strike Portions of the Indictment [ECF No. 47] and Motion to Dismiss the Indictment Based on the Court's Lack of Jurisdiction [ECF No. 49] The Government filed its responses in opposition. [ECF Nos. 64, 65]

### I.    Procedural History and Factual Background

On July 26, 2023, a federal grand jury indicted Defendants on one count of conspiracy in violation of 18 U.S.C. § 371 (Count I) and eight counts of making false statements relating to health care matters in violation of 18 U.S.C. §§ 1035 and 1032 (Counts II-IX). [ECF No. 1] Specifically, the indictment alleges that Defendant Saggar, a medical doctor who owned and operated several health care-related businesses, including Downtown Urgent Care LLC; Creve Coeur Urgent Care LLC, and St. Louis General Hospital (SLGH), and Defendant Barringer, the

officer manager of SLGH, fraudulently billed Medicare[1] and Medicaid[2] for claims for services provided at SLGH care facilities in Creve Coeur and the City of St. Louis.  [ECF No. 1, ¶¶ 1-2, 29, 37, 42]

The Government asserts in the indictment that Defendants hired medical school graduates who had not completed a residency program as "assistant physicians" ("APs") to provide services at those locations and then billed those services to Medicare and Medicaid as if Defendant Saggar performed the services. [ECF No. 1, ¶¶ 4, 28, 29 37] The indictment asserts that Medicare does not pay for any services conducted by APs, and that Medicaid only pays for services conducted by APs under certain conditions and that Defendants knowingly failed to meet those conditions. [ECF No. 1, ¶¶ 17, 22, 31-35]  Specifically, APs whose services are billed to Medicaid must be licensed by the Missouri Board of Registration for the Healing Arts (MBRHA) and supervised by a physician pursuant to a "collaborative practice arrangement" ("CPA"). [ECF No. 1, ¶22]  Under Missouri law, CPAs must be in writing and limit the AP to providing primary care services only in medically underserved rural or urban areas. [ECF No. 1, ¶5-7]

---

[1] The indictment states the United States Department of Health and Human Services, through the Centers for Medicare & Medicaid Services (CMS), administers the Medicare program, which is a federal health benefit program that provides the elderly and disabled with medical benefits, items, and services. [ECF No. 1, ¶13] Medicare Part B reimburses health care providers for covered health care services provided to Medicare beneficiaries and CMS administers Medicare Part B through its statutory fiscal agents, Medicare Administrative Contractors ("MACs"). [ECF No. 1, ¶ 15] The MACs are private entities that review claims and make payments to providers for serviced rendered to Medicare beneficiaries. [ECF No. 1, ¶ 16]  Here, Wisconsin Physicians Services Insurance Corporation was the MAC that processed reimbursement claims that Defendants submitted to Medicare. [ECF No. 1, ¶ 16]

[2] The indictment further states that MO HealthNet Administers the Missouri Medicaid Program, which is jointly funded by the State of Missouri and, through CMS, the federal government. [ECF No. 1, ¶ 19] Missouri Medicaid is a health care benefit program that provides low-income citizens of Missouri with medical benefits, items, and services. [ECF No. 1, ¶ 19] A Missouri Medicaid provider must enter into a written agreement with MO HealthNet to receive reimbursement for medical services to Medicaid recipients and must agree to abide by MO HealthNet's regulations in rendering and billing for those services. [ECF No. 1, ¶ 21]

The Government further alleges in the indictment that, pursuant to Missouri Revised Statute § 334.037.7, "[s]pecial rules apply when an AP practices under a CPA at a location when the collaborating physician is not 'continuously present.'" [ECF No. 1, ¶10] This includes that the collaborating physician must "determine and document the completion of at least a one-month period of time during which the [AP] shall practice with the collaborating physician continuously present…."[3] [ECF No. 1, ¶ 10, citing RSMo § 334.037.7 and 20 C.S.R. § 2150-2.240(1)(C)] The indictment asserts that, under Missouri regulation 20 C.S.R. § 2150-2.240(1)(D), "continuously present" means that "the supervising physician is physically present and seeing each and every patient with the [AP] when said AP is seeing and/or treating a patient." [ECF No. 1, ¶10]

Finally, the Government claims that Defendants billed Medicaid for services conducted by APs even though:  (1) there was no CPA between the AP and collaborating physician; (2) the APs did not receive the training required by 20 C.S.R. § 2150.2.240(1)(C)-(D), specifically, the 120 hours of clinic time during which the collaborating physician and the AP were required to see and treat patients together; and (3) the Creve Coeur location was not a medically unserved area and, therefore, APs were ineligible to practice at that location. [ECF No. 1, ¶¶ 31-34]

Defendants move the Court to strike paragraphs 10 and 32 referencing and relying upon 20 C.S.R. § 2150-2.240(1)(D) from the indictment pursuant to Fed. R. Crim. P. 7(d). [ECF No. 47] Defendants asserts these paragraphs are irrelevant to the indictment because 20 C.S.R. § 2150-2.240(1)(D)'s definition of "continuously present" impermissibly expands and modifies RSMo §334.037.7, the statute governing CPAs for APs, and, thus, "is null and void."  [ECF No. 47]

---

[3] The one-month period of time is equivalent to "a minimum of one hundred twenty (120) hours of clinic time, where the supervising physician and the [AP] are seeing and treating patients." [ECF No. 1, ¶ 10, citing 20 C.S.R. § 2150-2.240(1)(D)]

Defendants contend that reliance on a null and void regulation "that sets forth requirements that do not in fact exist" is "highly unfair and prejudicial[.]" [ECF No. 47]

With respect to their Motion to Dismiss the Indictment, Defendants contend the Court lacks jurisdiction over the indictment "due to the misapplication of the Fifth Amendment grand jury mandate" because the grand jury was instructed that a finding of probable cause was sufficient to issue the indictment. [ECF No. 49] More specifically, Defendants assert that the Government violated their Fifth Amendment right to a grand jury indictment of a criminal charge, because "founding-era" judges "rejected the idea that criminal charges required only…probable cause" and instead instructed "grand juries that they could only indict under a much higher standard." [ECF No. 49]

II.    Discussion

A.  Motion to Strike Portions of the Indictment

Fed. R. Crim. P. 7(d) provides that "[u]pon the defendant's motion the court may strike surplusage from the indictment."  A motion to strike surplusage from an indictment is a matter within the discretion of the district court. United States v. Morales, 813 F.3d 1058, 1066 (8th Cir. 2016).  However, the Eighth Circuit "has cautioned that such a motion 'should be granted only where it is clear [that] the allegations contained therein are not relevant to the charge made or contain inflammatory and prejudicial matter.'" Id. quoting (United States v. DeRosier, 501 F.3d 888, 897 (8th Cir.2007) (internal citations omitted); U.S. v. Figueroa, 900 F.2d 1211, 1218 (8th Cir. 1990).

"[L]egally relevant information is not surplusage." United States v. Haning, No. 4:18-CR-139 RWS/NAB, 2019 WL 9834329 at * 14 (E.D. Mo. Aug. 20, 2019), quoting United States v. Bucey, No. 86 CR 644, 691 F. Supp. 1077, 1081 (N.D. Ill. 1988). To determine whether a

matter is relevant under Rule 7(d), courts are guided by Federal Rule of Evidence 401 which provides that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." See Id. (citing to Fed. R. Evid. 401's definition of "relevant evidence" in determining whether to strike language from a superseding indictment pursuant to Rule 7(d)). "If the language in an indictment is information which the government hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be." Id. (quoting United States v. Palmer, No. 4:13-CR-338 RWS, 2014 WL 2217314 at *2 (E.D. Mo. May 29, 2014)). To the extent the Government's admissible evidence adduced at trial parallels the factual allegations in the indictment, the allegations cannot be properly characterized as inflammatory or prejudicial. See Figueroa, 900 F.2d at 1218 (holding allegations were neither irrelevant nor inflammatory and prejudicial because they closely paralleled the evidence adduced at trial).

1.  Validity of 20 C.S.R. § 2150-2.240(1)(D) as a Basis for a Rule 7(d) Motion to Strike Surplusage

Defendants argue that paragraphs 10 and 32 are irrelevant to the indictment and prejudicial because they reference a regulation, 20 C.S.R. § 2150-2.240(1)(D), "that is null and void[.]" [ECF No. 47] Specifically, Defendants assert that "a regulation which is null and void cannot have any relevance to an indictment" and that "it is highly unfair and prejudicial to rely on a regulation that is null and void and that sets forth requirements that do not in fact exist." [ECF No. 47] Defendants argue that the Court must decide the validity of the regulation in order to determine the propriety of striking paragraphs 10 and 32. [ECF No. 47] However, Defendants cite no authority for the proposition that a Rule 7(d) motion requires the Court to determine the validity of regulations referenced in an indictment.

Instead, Defendants primarily rely upon cases where a defendant sought to strike factual

5

allegations that were not relevant to establishing the elements of the charge. See United States v. Mock, No. 4:09 CR 679 HEA/DDN, 2011 WL 13103436, at *4-5 (E.D. Mo. Mar. 14, 2011) (seeking to strike from the indictment factual allegations that were not essential elements of the charges); United States v. Harder, No. 3:12-CR-00485-KI, 2014 WL 12783296, at *1-2 (D. Or. Mar. 17, 2014) (striking from the indictment as surplusage the word "looted" as "more prejudicial to the defendant then relevant and beneficial to understanding the charges" and the phrase "Ponzi scheme" as "inflammatory"); United States v. Cooper, No. CIV.A.6:04 CR 00006, 384 F.Supp.2d 958, 960 (W.D. Va. Apr. 13, 2005) (striking factual allegations from an indictment that were "'unnecessary' to establish a *prima facie* pleading of the violation" and that were inflammatory and unduly prejudicial); United States v. Paulus, No. 0:15-cr-15-DLB-EBA-1, 2015 WL 13735785, at *3-7 (E.D. Ky. Nov. 25, 2015) (report and recommendation recommending striking paragraphs that contained misrepresentations of facts as "more prejudicial then probative" but denying defendant's motion to strike additional factual allegations because they were not "irrelevant and prejudicial"); and United States v. Gerlay, No. 3:09-cr-085-JWS-JDR, 2009 WL 3872143, (D. Alaska Nov. 17, 2009) (striking factual allegations that were unnecessary to the charges and posed a sufficient "likelihood of unfair prejudice or confusion to the jury" and appeared "more prejudicial to the defendant then relevant and beneficial to understanding the charges" but denying the request to strike factual allegations that were relevant or essential to the charges).

Defendants cite to two cases in which the court considered striking portions of the indictment setting forth the statutes and regulations underlying the charges. United States v. Groos, No. 06 CR 420, 616 F. Supp. 2d 777 (N.D. Ill. June 13, 2008);  United States v. Quinn, No. CRIM. 05-0018(JDB), 401 F. Supp. 2d 80 (D. D.C. Oct. 21, 2005).  Although the court in

6

each case considered the validity of the statutory and regulatory scheme underlying the charges, this analysis was not conducted in conjunction with the defendant's Rule 7(d) motion to strike. Groos, 616 F. Supp. 2d 777, at *783-790; Quinn, 401 F. Supp. 2d 80, at * 89-100.  Instead, the defendants challenged the validity of the laws through a motion to dismiss certain charges in the indictments.  Groos, 616 F. Supp. 2d 777, at *783-789 (the defendant brought a Rule 12(b)(3) motion to dismiss two of the charges asserting the indictment failed to state an offense because the executive order extending the statutes and regulations were "statutorily and constitutionally invalid"); Quinn, 401 F. Supp. 2d 80, at * 89-97 (granting the Government's motion to strike portions of the indictment that referenced the appliable regulations in counts 2 through 6, noting the relief requested by the Government was the same as that "requested [by the defendants] in their motion to dismiss based on the alleged invalidity of the [regulations,]" and granting the defendants' motion to dismiss as to count 1 based on a finding that the regulation was inoperative at the time of the offense).

Based on the cases Defendants rely on in support of their Rule 7(d) motion, the Court concludes that Defendants failed to demonstrate that the validity of a regulation is an appropriate basis for a determination of surplusage within the meaning of Rule 7(d).  Accordingly, the Court declines to recommend striking paragraphs 10 and 32 pursuant to Rule 7(d) on the basis that the regulation referenced in those paragraphs are "null and void."[4]

---

[4] Even if a determination of a regulation's validity is a basis for analyzing the existence of surplusage, the Court is not persuaded the regulation at issue here is invalid. The essence of Defendants' argument is that 20 C.S.R §2150-2.240(1)(D) expands and modifies RSMo § 334.037.7, thus rendering it null and void, because the definition in subsection (D) of the regulation is broader than that found in subsection (C) of the regulation and other regulations promulgated by the MBRHA.  Even accepting that proposition as true, the Court is skeptical that the regulation is null and void due to a conflict between regulatory subsections, as opposed to a conflict between the regulation and the statute. See PharmFlex, Inc. v. Division of Employment Sec., 964 S.W.2d  825, 829-30 (Mo. App. W.D. 1997) (agency's rules and regulations are invalid if they are "unreasonable and plainly inconsistent with the act[,]" "if they are beyond the scope of authority conferred upon the agency, or if they attempt to expand or modify

2.  Relevancy and Prejudice of Paragraphs 10 and 32 as a Basis for Rule 7(d) Motion to Strike Surplusage

Although Defendants' request to strike paragraphs 10 and 32 is based primarily on their contention that 20 C.S.R. § 2150-2.240(1)(D) is null and void, Defendants also raise relevancy and prejudice concerns. As noted above, surplusage does not include information that is legally relevant. Haning, 2019 WL 9834329 at * 14. Evidence is relevant if it tends to make a fact more or less probable and the fact is of consequence in determining the case. Id. citing Fed. R. Evid. 401. Thus, information in an indictment which the government intends to prove at trial is not surplusage even if the information is prejudicial.  Id. When allegations in the indictment parallel the government's evidence at trial, the allegations are neither inflammatory nor prejudicial. See Figueroa, 900 F.2d at 1218.

 The paragraphs that Defendants challenge, paragraphs 10 and 32,[5] set forth the statutory and regulatory requirements for APs practicing under a CPA in a setting where the collaborating

---

statutes[,]" or if they "conflict with the statutes[.]") (emphasis added). Thus, Defendants have not presented persuasive authority supporting the conclusion that 20 C.S.R. § 2150-2.240(1)(D) is invalid due to a conflict with RSMo § 334.037.7.

[5]  These paragraphs state, in relevant part:

10. Special rules apply when an AP practices under a CPA at a location when the collaborating physician is not "continuously present." Mo. Rev. Stat.§ 334.037.7. "Continuously present" means that "the supervising physician is physically present and seeing each and every patient with the [AP] when said AP is seeing and/or treating a patient." 20 C.S.R. § 2150- 2.240(1)(D). Before an AP may practice under a CPA at a location where the collaborating physician is not continuously present, the collaborating physician must "determine and document the completion of at least a one-month period of time during which the [AP] shall practice with the collaborating physician continuously present ...." Mo. Rev. Stat. § 334.037.7; 20 C.S.R. § 2150-2.240(1)(C).

32. As a result of Dr. Saggar and Barringer's actions, the APs often never met and did not receive any training from their purported collaborating physicians, as required by 20 C.S.R. § 2150-2.240(1)(C)-(D). Contrary to the legal requirements regarding the use of APs, a collaborating physician was not continuously present at SLGH….

physician is not continuously present and allege that, due to Defendants' actions, the APs did not receive the training prescribed by the regulations. [ECF No. 1, ¶¶ 10 & 32] Clearly these allegations are relevant, providing both the legal and factual basis for some of the charges. See Haning, 2019 WL 9834329 at * 14 (holding that legally relevant information is not surplusage and that information which the government hopes to prove at trial is not surplusage even if prejudicial).

In addition, simply describing certain statutory and regulatory requirements and alleging that Defendants failed to comply with those requirements cannot be described as inflammatory or prejudicial within the meaning of Rule 7(d). See Id. 14-15 (information describing private industry standards and allegations that the defendant was surreptitiously acting as a company's "de facto decision maker" were relevant to showing the defendant's intent to defraud or a scheme to defraud and were not inflammatory or unduly prejudicial); Figueroa, 900 F.2d at 1218 (finding allegations in the indictment of overt acts committed in furtherance of the charged conspiracy were neither irrelevant nor inflammatory and prejudicial because the allegations closely paralleled the evidence adduced at trial, even though the government was not required to allege or prove an overt act). Accordingly, the Court concludes that Defendants have failed to demonstrate that the paragraphs at issue constitute irrelevant, inflammatory, or prejudicial material that should be stricken under Rule 7(d).

B. Motion to Dismiss the Indictment

Defendants move to dismiss the indictment for lack of jurisdiction pursuant to Federal Rules of Criminal Procedure 12(b)(2). [ECF No. 49] As grounds, Defendants argue that the indictment is void *ab initio*, and that the Court lacks jurisdiction over the indictment, because the grand jury was instructed that it could issue an indictment based on probable cause. [ECF No. 49]

Defendants contend this is a "misapplication of the Fifth Amendment grand jury mandate" because historical evidence demonstrates that a grand jury could not indict an individual for a criminal offense based on an evidentiary showing of only probable cause when the Fifth Amendment was ratified. [ECF No. 49] Defendants assert that "founding-era" cases, modern treatises examining "founding-era" writings, and Blackstone's Commentary describing the prevailing practice in 18th-century England demonstrate that "a much higher standard" than probable cause is required for a grand jury to issue an indictment.[6] [ECF No. 49] The Government opposes Defendants' motion asserting the United States Supreme Court has repeatedly held the probable cause standard is applicable to federal grand jury indictments and that all other federal courts are bound by the Supreme Court's determination. [ECF No. 65]

The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury[.]" U.S. Const. amend. V. Thus, grand jury indictments are "constitutionally mandated for the institution of federal criminal prosecutions for capital or other serious crimes[.]" Branzburg v. Hayes, 408 U.S. 665, 687 (1972). The text of the Fifth Amendment does not include a standard for the initiation of a prosecution by a grand jury. U.S. Const. amend. V; see also Albright v. Oliver, 510 U.S. 266, 282 (1994)(concurrence, Kennedy, J.) ("The specific provisions of [Fifth and Sixth Amendments to]

---

[6] While rejecting the probable cause standard, Defendants do not persuasively articulate a substitute standard for issuance of a grand jury indictment.[ECF No. 49] Defendants assert that "founding-era" materials suggest that the standards included the grand jury being "thoroughly persuaded," "satisfied," "well satisfied," "fully satisfied," "convinced," and "well convinced." [ECF No. 49, p. 8, citing William Ortman, *Probable Cause Revisited*, 68 Stan. L. Rev. 511, 530-31 (2016)] Other standards included issuance of an indictment only upon "the most unequivocal evidence," "moral certainty," "the most probable grounds," the "strongest appearance of criminality," and when the grand jurors' "consciences were satisfied." [ECF No. 49, p. 8, citing *Probable Cause Revisited*, 68 Stan. L. Rev. at 530-31] Defendants also cite to several 19h-centruy cases stating the standard for a grand jury indictment is the same as that for a petit jury rendering a conviction, that is, beyond a reasonable doubt. [ECF No. 49, p. 5-6]

the Bill of Rights neither impose a standard for the initiation of a prosecution…nor require a pretrial hearing to weigh evidence according to a given standard[.]"citing <u>Gerstein v. Pugh</u>, 420 U.S. 103, 119 (1975) and <u>Costello v. United States</u>, 350 U.S. 369, 363 (1956)).

A grand jury serves as "a body of accusers sworn to discover and present for trial persons suspected of criminal wrongdoing and as a protector of citizens against arbitrary and oppressive governmental action." <u>United States v. Calandra</u>, 414 U.S. 338, 342-43 (1974). Moreover, a grand jury has the responsibilities of determining "whether there is probable cause to believe a crime has been committed and the protection of citizens against unfounded criminal prosecutions." <u>Id.</u> at 343. "A grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated. Rather, it is an ex parte investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person." <u>Id.</u> at 343-43, 349 ("the grand jury does not finally adjudicate guilt or innocence); <u>see also</u> <u>U.S. v. Williams</u>, 504 U.S. 36, 51 (1992) ("It is axiomatic that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge."); <u>Bracy v. United States</u>, 435 U.S. 1301, 1302 (1978)(Rehnquist, J. Op. in chambers)(denying request to stay enforcement of the judgment pending disposition of a petition for certiorari based on allegation that a grand jury witness committed perjury because "[t]he grand jury does not sit to determine the truth of the charges brought against a defendant, but only to determine whether there is probable cause to believe them true, so as to require him to stand trial.").

Defendants concede that "[i]n more recent history, courts at every level have applied a 'probable cause' standard of proof to the decisions of federal grand juries." [ECF No. 49] Defendants maintain, however, that "no Supreme Court decision has ever actually announced" that

probable cause is the standard for grand jury indictments and that "modern courts have simply assumed" that probable cause was the standard. [ECF No. 49]

The Court is unpersuaded by Defendants' contention that courts only use a probable cause standard of proof based on, in essence, unwarranted assumptions rather than reliance on United States Supreme Court precedent. To the contrary, the Supreme Court has clearly articulated that a grand jury indictment must be supported by probable cause. See Branzburg v. Hayes, 408 U.S. 665, 686-687 (1972) ("ancient role of the grand jury [is] that [it] has the duel function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens from unfounded criminal prosecutions"); Kaley v. U.S., 571 U.S. 320, 328 (2014) ("This Court has often recognized the grand jury's singular role in finding the probable cause necessary to initiate a prosecution for a serious crime"); Ex parte United States, 287 U.S. 241, 249-50 (1932) ("The question whether there was probable cause for putting the accused on trial was for the grand jury to determine" and "[i]t reasonably cannot be doubted that, in the court to which the indictment is returned, the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer."); Calandra, 414 U.S. at 342-43.[7]

---

[7] Reliance on the probable cause standard for grand jury indictments extends beyond Fifth Amendment jurisprudence. See Gerstein, 420 U.S. at 117, n. 19, quoting Ex parte United States, 287 U.S. at 250 (requiring a judicial finding of probable cause to hold a defendant arrested on an information and distinguishing the detention of a criminal defendant based on an indictment because "an indictment 'fair upon its face,' and returned by a 'properly constituted grand jury, conclusively determines the existence of probable cause"); Giordenello v. U.S., 357 U.S. 480, 486-487 (1958) (holding a judicial finding of probable cause necessary and an adequate basis for such a finding had to appear on the face of the complaint, as distinguished from an arrest warrant based upon an indictment because "the grand jury's determination that probable cause existed for the indictment also establishes that element for the purpose of issuing a warrant for the apprehension of the person so charged"); Kalina v. Fletcher, 522 U.S. 118, 129 (1997) (Fourth Amendment requirement that arrest warrants be based upon probable cause may be satisfied by an indictment returned by a grand jury but not by the filing of criminal charges in an unsworn information signed by the prosecutor).

Defendants assert this Court is not bound by the Supreme Court's statements on the matter because they are non-binding *dicta*, in that "no Supreme Court decision has ever actually announced that the standard for indictment shall henceforth be 'probable cause.'" [ECF No. 49] Further, Defendants contend that the Supreme Court's *dicta* is inconsistent with "founding-era" cases and writings, including Blackstone's Commentary, demonstrating that more than probable cause was necessary for issuance of grand jury indictment when the Fifth Amendment was ratified. [ECF No. 49]

This Court rejects Defendants' invitation to abandon the probable cause standard. In Beavers v. Henkel, 194 U.S. 73, 83-85 (1904), the Supreme Court considered the Fifth Amendment's grand jury clause and Blackstone's stance on the quantum of proof necessary for a grand jury indictment, and concluded that probable cause was the applicable standard. In Beavers, the petitioner sought a writ of habeas corpus after he was arrested on a warrant issued by a district court based upon a federal grand jury indictment issued in a different district. Id. at 73. During the removal proceeding in the district that issued the arrest warrant, the petitioner challenged the sufficiency of the indictment. Id. 73, 87-88. The Supreme Court analyzed whether (1) the indictment was competent and "conclusive evidence against the accused of the facts therein alleged" and (2) the indictment was entitled to "any probative force." Id. at 82. In deciding the issues, the Court stated:

> In light of these considerations we pass to an inquiry into the special matters here presented. Article 5 of the amendments to the Constitution provides:
>
> 'No person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury...'
>
> While many states, in the exercise of their undoubted sovereignty...have provided for trials of criminal offenses upon information filed by the prosecuting officer, and without any previous inquiry or action by a grand jury, the national Constitution, in its solicitude for the protection of the individual, requires an

indictment as a prerequisite to a trial. The grand jury is a body known to the common law, to which is committed the duty of inquiring whether there be probable cause to believe the defendant guilty of the offense charged. Blackstone says (vol.4, p. 303):

'This grand jury are previously instructed in the articles of their inquiry, by a charge from the judge who presides upon the bench. They then withdraw, to sit and receive indictments, which are preferred to them in the name of the King, but at the suit of any private prosecutor; and they are only to hear evidence on behalf of the prosecution; for the finding of an indictment is only in the nature of an inquiry or accusation, which is afterwards to be tried and determined; and the grand jury are only to inquire, upon their oaths, whether there be sufficient cause to call upon the party to answer it. A grand jury, however, ought to be thoroughly persuaded of the truth of an indictment, so far as their evidence goes; and not to rest satisfied merely with remote probabilities: a doctrine that might be applied to very oppressive purposes.' [Blackstone, vol. 4, p. 303]

The thought is that no one shall be subjected to the burden and expense of a trial until there has been a prior inquiry and adjudication by a responsible tribunal that there is probable cause to believe him guilty. But the Constitution does not require two such inquiries and adjudications. The government, having once satisfied the provision for an inquiry, and obtained an adjudication by the proper tribunal of the existence of probable cause, ought to be able, without further litigation concerning that fact, to bring the party charged into court for trial. The existence of probable cause is not made more certain by two inquiries and two indictments. Within the spirit of the rule of giving full effect to the records and judicial proceedings of other courts, an indictment, found by the proper grand jury should be accepted everywhere through the United States as at least prima facie evidence of the existence of probable cause. And the place where such inquiry must be had and the decision of a grand jury obtained is the locality in which, by the Constitution and laws, the final trial must be had.

Id. at 84-85.

Defendants contend the Supreme Court in Beavers, "simply assumed the probable cause standard without any discussion at all…notwithstanding that Blackstone clearly indicated a standard higher than mere probable cause, i.e., 'thoroughly persuaded of the truth.'" [ECF No. 49]  However, the quoted section demonstrates that the Supreme Court did not "assume" that probable cause was the standard but instead considered Blackstone's Commentary and defined probable cause as the standard.

Although not phrased as such, Defendants true contention appears to be that the Supreme Court erred in Beavers by misinterpreting Blackstone and failing to engage in additional analysis of "founding-era" sources. Regardless of whether Defendants agree with the Supreme Court's analysis in Beavers, this Court is bound by the Supreme Court's ruling. As the Eighth Circuit has recently held, federal courts are bound to follow Supreme Court decisions until the Supreme Court overrules them. Kohlbeck v. Wyndham Vacation Resorts, Inc., 7 F.4th 729, 734 (8th Cir. 2021). Thus, this Court is bound by the Supreme Court's holding that a grand jury may issue an indictment only upon a finding of probable cause. Accordingly, the Court rejects Defendants contention that the grand jury in this case improperly used probable cause as the standard of proof when it returned an indictment against Defendants.

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that Defendants' Motion to Strike Portions of the Indictment [ECF No. 47] be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Defendant's Motion to Dismiss the Indictment [ECF No. 49] be **DENIED**.

**The parties are advised that they have fourteen (14) days after service of this Report and Recommendation in which to file written objections to it**, unless an extension of time for good cause is obtained.  Failure to file timely objections may result in a waiver of the right to review.  See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990) (per curiam); 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59.

This matter will be set for trial at a later date before the Honorable Stephen R. Clark, United States District Judge.

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 20th day of December, 2023