UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:23-CR-00380-SRC |
| | ) | |
| SONNY SAGGAR, M.D., | ) | |
| | ) | |
| Defendant. | ) | |

## GUILTY PLEA AGREEMENT

Come now the parties and hereby agree, as follows:

### 1. PARTIES:

The parties are the defendant, Sonny Saggar, M.D., represented by defense counsel William Marsh and Nicholas Williams, and the United States of America (hereinafter "United States" or "Government"), represented by the Office of the United States Attorney for the Eastern District of Missouri. This agreement does not, and is not intended to, bind any governmental office or agency other than the United States Attorney for the Eastern District of Missouri. The Court is neither a party to nor bound by this agreement.

### 2. GUILTY PLEA:

Pursuant to Rule 11(c)(1)(A), Federal Rules of Criminal Procedure, in exchange for the defendant's voluntary plea of guilty to Count 1 of the charge, the Government agrees to move for the dismissal as to the defendant of Counts 2 through 9 at the time of sentencing. Moreover, the United States agrees that no further federal prosecution will be brought in this District against the

1

defendant relative to the conduct described in the Indictment, filed July 26, 2023, of which the Government is aware at this time.

In addition, the parties agree that the U.S. Sentencing Guidelines Total Offense Level analysis agreed to by the parties herein is the result of negotiation and led, in part, to the guilty plea. The parties further agree that either party may request a sentence above or below the U.S. Sentencing Guidelines range (combination of Total Offense Level and Criminal History Category) ultimately determined by the Court pursuant to any chapter of the Guidelines and Title 18, United States Code, Section 3553(a). The parties further agree that notice of any such request will be given no later than ten days prior to sentencing and that said notice shall specify the legal and factual bases for the request.

The defendant also agrees, pursuant to the guilty plea to Count 1, to forfeit to the United States all property subject to forfeiture under the applicable statute(s), including but not limited to: a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offense.

## 3. **ELEMENTS:**

As to Count 1, the defendant admits to knowingly violating Title 18, United States Code, Section 371, and admits there is a factual basis for the plea and further fully understands that the elements of the crime are:

*One*, two or more persons reached an agreement or came to an understanding to make false statements related to health care matters, in violation of 18 U.S.C. § 1035;

2

*Two*, the defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect;

*Three*, at the time the defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding; and

*Four*, while the agreement or understanding was in effect, a person or persons who had joined in the agreement or understanding knowingly did one or more overt acts for the purpose of carrying out or carrying forward the agreement or understanding.

## 4. **FACTS:**

The parties agree that the facts in this case are as follows and that the government would prove these facts beyond a reasonable doubt if the case were to go to trial. These facts may be considered as relevant conduct pursuant to Section 1B1.3:

### Defendants and Co-Conspirators Nos. 1 and 2

a.      At all relevant times, the defendant was a medical doctor, licensed to practice in the state of Missouri. Since at least as early as 2012, the defendant has operated one or more health care related businesses, including: Downtown Urgent Care LLC; Creve Coeur Urgent Care LLC; and, since in or about September 2017, St. Louis General Hospital ("SLGH"). At all relevant times, SLGH was an urgent care and primary care clinic that had two locations: one at 916 Olive Street, St. Louis, Missouri 63101 (the "Downtown Location"), and the other at 13035 Olive Boulevard, Creve Coeur, Missouri 63141 (the "Creve Coeur Location"). At all relevant times, the defendant was listed as the president of SLGH and as a member of the board of directors for SLGH.

3

b.    At all relevant times, co-defendant Renita Barringer ("Barringer") was the office manager for SLGH.  As the office manager of SLGH, Barringer's responsibilities included the day-to-day operations, staffing, schedules, credentialing, assisting with and participating in billing, and other administrative duties.  On or about April 14, 2020, Barringer was added as a member of the board of directors for SLGH.  On or about April 21, 2023, Barringer also became the secretary for SLGH.

c.    At all relevant times, Co-Conspirator No. 1 was a medical doctor, licensed to practice in the state of Missouri.  In or about January 2022, the defendant hired Co-Conspirator No. 1 as a physician at the Creve Coeur Location of SLGH, as further described below.

d.    At all relevant times, Co-Conspirator No. 2 held himself out as a medical coding and billing specialist, and, through his company, provided coding and billing services to SLGH.

**Requirements Regarding Assistant Physicians in the State of Missouri**

e.    In Missouri, an "assistant physician," or "AP," is any medical school graduate who:

(a) Is a resident and citizen of the United States or is a legal resident alien;

(b) Has successfully completed Step 2 of the United States Medical Licensing Examination or the equivalent of such step of any other board-approved medical licensing examination within the three-year period immediately preceding application for licensure as an assistant physician, or within three years after graduation from a medical college or osteopathic medical college, whichever is later;

(c) Has not completed an approved postgraduate residency and has successfully completed Step 2 of the United States Medical Licensing Examination or the equivalent of such step of any other board-approved medical licensing examination within the immediately preceding three-year period unless when such three-year anniversary occurred he or she was serving as a resident physician in an accredited residency in the United States and continued to do so within thirty days prior to application for licensure as an assistant physician; and

4

(d) Has proficiency in the English language.

Mo. Rev. Stat. § 334.036.1(1).

      f.     The defendant admits that, in order to legally provide medical services in Missouri, an AP must enter into a "collaborative practice arrangement," or "CPA." Mo. Rev. Stat. § 334.036.4. A CPA is an agreement between an AP and a physician that sets forth restrictions on the AP's ability to provide medical services and imposes supervisory duties on the physician, who is sometimes referred to as the "collaborating" physician or the "collaborator." Mo. Rev. Stat. §§ 334.036.1(2), 334.037.

      g.     The defendant admits that the "collaborating physician is responsible at all times for the oversight of the activities of and accepts responsibility for primary care services rendered by the [AP]." Mo. Rev. Stat. § 334.036.5. The defendant further admits that APs may only practice pursuant to CPAs that limit the AP to providing only primary care services and only in medically underserved rural or urban areas in Missouri, or in any pilot project areas established in which APs may practice. Mo. Rev. Stat. § 334.036.2.

      h.     CPAs must be in writing and must contain, among other things: the names and addresses of the AP and collaborating physician; a list of all locations where the collaborating physician has authorized the AP to prescribe; all specialty or board certifications of the collaborating physician and all certifications of the AP; a description of the AP's controlled substance prescribing authority in collaboration with the collaborating physician; the duration of the CPA between the collaborating physician and the AP; a description of the time and manner of the collaborating physician's review of the AP's delivery of health care services, including a

5

provision that the AP shall submit a minimum of ten percent of the charts documenting the AP's delivery of health care services to the collaborating physician for review every fourteen days; and the "manner of collaboration" between the collaborating physician and the AP, including how the collaborating physician and the AP will maintain geographic proximity. Mo. Rev. Stat. § 334.037.1-2.

  i.  The defendant admits that the collaborating physician may not be so geographically distanced from the AP "as to create an impediment to effective collaboration in the delivery of health care services or the adequate review of those services," and, in cases of the diagnosis and initiation of treatment for acutely or chronically ill or injured persons, the collaborating physician shall be no more than 75 miles away from the AP. 20 C.S.R. § 2150-2.240(1)(A)-(B).

  j.  The defendant admits that, at any given time, a collaborating physician may not enter into more than a total of six CPAs—whether those CPAs are entered into with full-time APs, full-time advance practice registered nurses (sometimes referred to as nurse practitioners), full-time physician assistants, or any combination thereof. Mo. Rev. Stat. § 334.037.6; 20 C.S.R. § 2150-2.240(1)(E).

  k.  The defendant admits that special rules apply when an AP practices under a CPA at a location when the collaborating physician is not "continuously present." Mo. Rev. Stat. § 334.037.7. "Continuously present" means that "the supervising physician is physically present and seeing each and every patient with the [AP] when said AP is seeing and/or treating a patient." 20 C.S.R. § 2150-2.240(1)(D). The defendant admits that, before an AP may practice

under a CPA at a location where the collaborating physician is not continuously present, the collaborating physician must "determine and document the completion of at least a one-month period of time during which the [AP] shall practice with the collaborating physician continuously present . . . ." Mo. Rev. Stat. § 334.037.7; 20 C.S.R. § 2150-2.240(1)(C). In this context, a one-month period of time is equivalent to "a minimum of one hundred twenty (120) hours of clinic time, where the supervising physician and [AP] are seeing and treating patients." 20 C.S.R. § 2150-2.240(1)(D).

      l.    The Missouri Board of Registration for the Healing Arts ("MBRHA") is the state regulatory agency that oversees compliance with the licensure procedures and supervision guidelines pertaining to APs. Mo. Rev. Stat. §§ 334.036.3(1), 334.037.3.

      m.    The defendant admits that an AP wishing to be licensed as such in Missouri must submit an application to the MBRHA. The defendant further admits that the application includes, among other things, an Assistant Physician Verification of Collaborative Practice Arrangement form ("CPA Verification Form"), which requires the collaborating physician and the AP to be identified by name and address. The defendant admits that the CPA Verification Form requires the collaborating physician to sign a certification statement that contains the following acknowledgements, which the defendant signed on numerous occasions before and during the relevant time frame regarding multiple different APs:

> I will be supervising the above named assistant physician for the delivery of health care services within the assistant physician's scope of practice and consistent within each collaborating professional's skill, training, and competence and the skill training of myself. (334.037.1 and 334.037.2(5)(a))

I understand I am responsible at all times for the oversight of the activities of and accept responsibility for primary care services rendered by the assistant physician. (334.036.5)

I understand the collaborative practice agreement shall meet the requirements set forth in 334.037 and 20 CSR 2150-2.240 such as maintaining geographical proximity, reviewing charts and delegating controlled-substance prescriptive authority.

I understand the collaborative practice agreement shall limit the assistant physician to providing only primary care services and only in medically underserved rural or urban areas of this state or in any pilot project areas established in which assistant may practice; (334.036.2)

I will notify the [MBRHA] of any change or termination of a collaborative practice arrangement within fifteen (15) days of such occurrence; **and** (20 CSR 2150-2.250(1)

I have reviewed this document with the above named assistant physician and have reviewed the Statutes, Rules and Regulations that govern the practice of assistant physicians in the State of Missouri, including but not limited to 334.036 -334.038 and 20 CSR 2150-2.200 - 20 CSR 2150-2.260.

### The Medicare Program

n.      The United States Department of Health and Human Services, through the Centers for Medicare & Medicaid Services (CMS), administers the Medicare program, which is a federal health benefit program within the meaning of 18 U.S.C. § 24(b) that affects interstate commerce and provides the elderly and disabled with medical benefits, items, and services.

o.      Benefits are administered through different parts of the Medicare program, referred to as Part A, Part B, Part C, and Part D, which relate to different services provided through the Medicare program.

p.      Medicare Part B reimburses health care providers for covered health care services provided to Medicare beneficiaries in outpatient settings.  CMS administers Medicare Part B

8

through its statutory fiscal agents, called Medicare Administrative Contractors or "MACs."
Wisconsin Physicians Service Insurance Corporation ("WPS") is the Part B MAC for Eastern
Missouri and thus processes reimbursement claims that the defendant, Barringer, Co-Conspirator
No. 1, and Co-Conspirator No. 2 submitted and caused to be submitted to Medicare.

q.      To receive Medicare Part B reimbursement, providers must make appropriate
application to the MAC and execute a written provider agreement. The provider agreement
obligates the provider to know, understand, and follow all Medicare regulations and rules. After
successful completion of the application process, the MAC assigns the provider a unique
provider number, which is a necessary identifier for billing purposes.

r.      Medicare Part B does not pay for services provided by an AP, except for in
limited circumstances not applicable to the services that the defendant, Barringer, Co-
Conspirator No. 1, and Co-Conspirator No. 2 billed and caused to be billed in connection with
SLGH. 42 C.F.R. §§ 415.170, 415.172, 415.174.

s.      The defendant admits that he has been an enrolled Medicare provider since at
least December 1, 2009, and has filled out and submitted numerous Medicare applications since
that time. The defendant admits that Section 14 of each application, entitled "Penalties for
Falsifying Information," informed the defendant that he could be criminally prosecuted (a) for
executing or attempting to execute a health care fraud scheme or using false or fraudulent
statements or representations to obtain money from a health care benefit program or (b) making
or using false or fraudulent statements or representations in connection with the delivery or
payment for health care benefits, items, or services. The defendant admits that he signed the

9

"Certification Statement" of each application and thereby repeatedly certified:

> I have read and understand the Penalties for Falsifying Information, as printed in the application. I understand that any deliberate omission, misrepresentation, or falsification of any information . . . contained in any communication supplying information to Medicare . . . [may be criminally prosecuted].

> I agree to abide by the Medicare laws, regulations and program instructions . . . including the Federal anti-kickback statute . . .

> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

### The Medicaid Program

t.      MO HealthNet administers the Missouri Medicaid program, which is jointly funded by the State of Missouri and through CMS, the federal government. Missouri Medicaid is a health care benefit program within the meaning of 18 U.S.C. § 24(b) that affects interstate commerce and provides low-income citizens of Missouri with medical benefits, items, and services.

u.      A Medicaid provider must enter into a written agreement with MO HealthNet to receive reimbursement for medical services to Medicaid recipients and must agree to abide by MO HealthNet's regulations in rendering and billing for those services.

v.      Medicaid pays for certain types of primary care-related services provided by an AP if: (1) the AP has a CPA that is in writing with a licensed physician and otherwise in compliance as required by Mo. Rev. Stat. § 334.037; and (2) the AP is licensed by the MBRHA.

w.      The defendant admits that he has been a Medicaid provider since at least July 1, 2005. The defendant further admits that, on numerous occasions since that time, he signed

10

Medicaid applications in which he certified that he would comply with all Missouri Medicaid program rules and regulations.

## Description of the Conspiracy

x.      The defendant admits that, beginning on or about July 10, 2018 and continuing to in or about July 2023, he and Barringer employed numerous APs through SLGH and engaged in the conspiracy conduct described below.  The defendant admits that he and Barringer advertised SLGH as both an urgent care and primary care clinic designed to reduce emergency room visits and associated costs, as well as a "residency prep" program for APs.  The defendant further admits that he publicly promoted SLGH—through its internet website and various media outlets—as a "stepping stone" for medical school graduates who have been unable to secure a residency and thus are ineligible to obtain a standard license to practice medicine.

y.      The defendant admits that he and Barringer hired Co-Conspirator No. 2 to perform billing and coding services for SLGH.  The defendant further admits that he, Barringer, and Co-Conspirator No. 2 conspired to bill un-reimbursable services to Medicare and Medicaid that were performed by APs but billed as if they had been performed by the defendant.  In addition, the defendant admits that he and Barringer hired Co-Conspirator No. 1 to be the sole collaborating physician at the Creve Coeur Location of SLGH, and that Barringer, Co-Conspirator No. 1, and Co-Conspirator No. 2 caused claims for payment to be made to Medicare and Medicaid that falsely listed the defendant as the rendering provider when in fact they were performed by Co-Conspirator No. 1, who was under federal indictment at the time and whose services were not reimbursable by Medicare and Medicaid.

11

z.      The defendant admits that he and Barringer recruited and offered stipends to physicians to induce them to sign up to be collaborating physicians for APs at SLGH, and that he and Barringer falsely told those physicians that they merely needed to sign blank, undated CPA Verification Forms in order to fulfill their roles as collaborating physicians.  The defendant admits that, as part of these efforts, on or about October 29, 2019, he emailed physician L.H. asking L.H. if L.H. would be willing to serve as a collaborating physician for SLGH and offered a "stipend of $480/month ($80/mid-level/month) for up to 6 mid-levels."  The defendant admits that, when L.H. asked what the collaborating physician was required to do, the defendant stated, "Nothing.  Except sign the form that agrees to be the [collaborating physician], once a year.  The State just needs to assign the mid-levels to a [collaborating physician]."

aa.     The defendant further admits that these pre-signed CPA Verifications Forms were used to falsely represent to the MBRHA that SLGH's APs had CPAs in place, even though, as the defendant and Barringer knew, no CPA existed between the AP and the purportedly collaborating physician.

bb.     The defendant admits that, as result of his and Barringer's actions, APs often did not meet and did not receive any training from their purported collaborating physicians, as required by 20 C.S.R. § 2150-2.240(1)(C)-(D).  The defendant further admits that, contrary to the legal requirements regarding the use of APs, a collaborating physician was not continuously present at SLGH, and APs frequently saw patients without a collaborating physician present, even though they had not received the required 120 hours of clinic time during which the collaborating physician and the AP were required to see and treat patients together.

12

cc.     The defendant admits that, rather than ensuring APs received training and supervision from their purported assigned collaborating physicians, he and Barringer both encouraged APs at SLGH to consult with each other regarding medical questions.

dd.     The defendant admits that he and Barringer, in collaboration with and with the assistance of Co-Conspirator No. 2, caused claims for services provided at SLGH to be billed to the Medicare and Missouri Medicaid programs.  The defendant admits that he, Barringer, and Co-Conspirator No. 2 all knew that claims for services performed at SLGH were being submitted to Medicare and Missouri Medicaid as if they had been performed by the defendant even though the defendant, Barringer, and Co-Conspirator No. 2 all knew that the services were in fact being performed by APs.

ee.     More specifically, the defendant admits that he, Barringer, and Co-Conspirator No. 2 caused claims to be billed to Medicare that falsely listed the defendant as the rendering provider, when in fact APs—for whose service Medicare did not pay (except in limited circumstances not applicable here)—were providing services.

ff.     The defendant admits that he, Barringer, and Co-Conspirator No. 2 also caused claims to be billed to Medicaid that falsely listed the defendant as the rendering provider even though the services were rendered by APs who did not have CPAs or adequate supervision in place and thus were not reimbursable by Medicaid.  The defendant further admits that the Creve Coeur Location of SLGH was not a medically underserved or urban area and that, as a result, APs were entirely ineligible to practice there and Medicaid, in turn, would not have paid claims for services conducted at the Creve Coeur Location had it known that APs had performed the services.

gg.     The defendant further admits that he, Barringer, and Co-Conspirator No. 2 caused SLGH claims to be billed to Medicare and Missouri Medicaid that falsely indicated the defendant was the performing provider, even during times when the defendant was out of town, including during times when he was abroad.

hh.     The defendant admits that, in or about January 2022, he and Barringer hired Co-Conspirator No. 1 to be the sole collaborating physician at the Creve Coeur Location.   The defendant admits that he knew at the time he hired Co-Conspirator No. 1 that Co-Conspirator No. 1 was under a federal criminal indictment in the Eastern District of Missouri in another case. As a result of that indictment, Co-Conspirator No. 1's previously-existing Medicaid billing privileges were suspended in a February 27, 2020 letter sent to Co-Conspirator No. 1, which stated in relevant part that Medicaid was

> suspending your participation in the Missouri Medicaid ("MO HealthNet") program effective 30 days from the date of this letter or its delivery, whichever occurs first until a final legal decision is rendered.  This suspension will result in [MO HealthNet Division] prohibiting you from submitting any further claims and/or from receiving payment for services provided to [MO HealthNet Division] participants individually or through any clinic, association, corporation, partnership, or other affiliate, during the period of time that your provider number is suspended.
>
> . . .
>
> Note that the suspension of your [MO HealthNet Division] provider number includes no longer providing services to [MO HealthNet Division] participants enrolled with [MO HealthNet Division] managed care health plans.  You may not participate in [MO HealthNet Division] managed care health plans and, therefore, may not be reimbursed by [MO HealthNet Division] managed care health plans during the period of time your provider number is suspended.  It is your obligation to inform [MO HealthNet Division] managed care health plans with whom you contract of this action.

ii.     The defendant admits that Co-Conspirator No. 1 concealed the above-described suspension from the defendant and that, upon being hired by the defendant and Barringer, Co-

Conspirator No. 1 saw and treated Medicaid patients at the Creve Coeur Location even though he was prohibited from billing Medicaid. The defendant admits that he, Co-Conspirator No. 1, and Co-Conspirator No. 2 concealed from both Medicaid and Medicare that Co-Conspirator No. 1 was performing services at the Creve Coeur Location by naming the defendant, rather than Co-Conspirator No. 1, as the rendering provider in the claims for payment.

jj.      The defendant admits that, as a result of the conspiracy to make false statements related to health care matters described in Count 1, the defendant was responsible for causing a total loss of $742,528.07 to the Medicare and Missouri Medicaid programs, as more specifically set forth below:

| Category | Payor | | Type of Claim | Amount Paid |
|---|---|---|---|---|
| 1 | Medicare | | Claims for services rendered by APs but billed under the defendant's name from July 10, 2018 to July 2023 | $642,942.70 |
| 2 | Medicaid | | Claims for un-reimbursable services (i.e. performed by unsupervised APs and/or performed at the Creve Coeur Location) and billed under the defendant's name from July 10, 2018 to July 2023 | $99,585.37 |

## 5. STATUTORY PENALTIES:

The defendant fully understands that the maximum possible penalty provided by law for the crime to which the defendant is pleading guilty is imprisonment of not more than five years, a fine of not more than $250,000, or both such imprisonment and fine. The Court may also impose a period of supervised release of not more than three years.

## 6. U.S. SENTENCING GUIDELINES (2023 MANUAL):

The defendant understands that this offense is affected by the U.S. Sentencing Guidelines and the actual sentencing range is determined by both the Total Offense Level and the Criminal

15

History Category.  The parties agree that the following U.S. Sentencing Guidelines Total Offense Level provisions apply.

**a.  Chapter 2 Offense Conduct:**

(1)  **Base Offense Level**:  The parties agree that the base offense level is 6, as found in Sections 2B1.1 and 2X1.1.

(2)  **Specific Offense Characteristics**:  The parties agree that the following Specific Offense Characteristics apply:  The parties agree that 14 levels should be added pursuant to Section 2B1.1(b)(1)(H) because the loss amount exceeds $550,000 but is less than $1,500,000.

**b.  Chapter 3 and 4 Adjustments:**

(1)  **Acceptance of Responsibility:** The parties recommend that two levels should be deducted pursuant to U.S.S.G. § 3E1.1(a) because the defendant has clearly demonstrated acceptance of responsibility.  If this deduction is applied, and if the defendant is otherwise eligible, then the Government moves to deduct one additional level pursuant to U.S.S.G. § 3E1.1(b), because the defendant timely notified authorities of the intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

The parties agree that the defendant's eligibility for this deduction is based upon information presently known.  If subsequent to the taking of the guilty plea the Government receives new evidence of statements or conduct by the defendant which it believes are inconsistent with defendant's eligibility for this deduction, the Government may present said

16

evidence to the Court, and argue that the defendant should not receive all or part of the deduction pursuant to Section 3E1.1, without violating the plea agreement.

      (2)  **Other Adjustments:**  The parties agree that the following additional adjustments apply:

The parties agree that two levels should be added, pursuant to Section 3B1.3, because the defendant abused a position of public or private trust.

The parties dispute whether two levels should be added, pursuant to Section 3B1.1(c), and whether the defendant was an organizer, leader, manager, or supervisor of the criminal activity and will argue their respective positions at sentencing.

      (3)  **Adjustment for Certain Zero-Point Offenders:**  If the Court determines that the defendant does not receive any criminal history points from Chapter 4, Part A, and if the Court determines that the defendant should not receive an adjustment for an aggravating role under Section 3B1.1, then the parties agree that two levels should be deducted under Section 4C1.1(a), because the defendant, in that case, would meet all of the criteria under Section 4C1.1(a)(2) through (a)(10).

    **c.**  **Estimated Total Offense Level:**  If the Court applies a two-level adjustment for an aggravating role under Section 3B1.1(c), the parties estimate that the Total Offense Level is 21.

    **d.**  **Criminal History:**  The determination of the defendant's Criminal History Category shall be left to the Court. Either party may challenge, before and at sentencing, the finding of the Presentence Report as to the defendant's criminal history and the applicable category. The defendant's criminal history is known to the defendant and is substantially available in the Pretrial Services Report.

e. **Effect of Parties' U.S. Sentencing Guidelines Analysis:** The parties agree that the Court is not bound by the Guidelines analysis agreed to herein. The parties may not have foreseen all applicable Guidelines. The Court may, in its discretion, apply or not apply any Guideline despite the agreement herein and the parties shall not be permitted to withdraw from the plea agreement.

7. **WAIVER OF APPEAL AND POST-CONVICTION RIGHTS:**

a. **Appeal:** The defendant has been fully apprised by defense counsel of the defendant's rights concerning appeal and fully understands the right to appeal the sentence under Title 18, United States Code, Section 3742.

(1) **Non-Sentencing Issues:** The parties waive all rights to appeal all non-jurisdictional, non-sentencing issues, including, but not limited to, any issues relating to pretrial motions, discovery and the guilty plea.

(2) **Sentencing Issues:** The parties disagree as to whether the defendant should receive an adjustment for an aggravating role pursuant to Section 3B1.1 and will litigate that issue at sentencing. The parties agree to abide by the Court's determination of that issue and specifically waive their rights to appeal the Court's ruling resulting in the calculation of the Total Offense Level. In the event the Court accepts the plea, and after determining the Total Offense Level, sentences the defendant within or below that corresponding range, then, as a part of this agreement, the defendant hereby waives all rights to appeal all sentencing issues other than Criminal History, but only if it affects the Base Offense Level or Criminal History Category. Similarly, the Government hereby waives all rights to appeal all sentencing issues other than

Criminal History, provided the Court accepts the plea and, after determining the Total Offense Level, sentences the defendant within or above that corresponding range.

    **b. Habeas Corpus:** The defendant agrees to waive all rights to contest the conviction or sentence in any post-conviction proceeding, including one pursuant to Title 28, United States Code, Section 2255, except for claims of prosecutorial misconduct or ineffective assistance of counsel.

    **c. Right to Records:** The defendant waives all rights, whether asserted directly or by a representative, to request from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 522, or the Privacy Act, Title 5, United States Code, Section 552(a).

**8. OTHER:**

    **a. Disclosures Required by the United States Probation Office:** The defendant agrees to truthfully complete and sign forms as required by the United States Probation Office prior to sentencing and consents to the release of these forms and any supporting documentation by the United States Probation Office to the government.

    **b. Civil or Administrative Actions not Barred; Effect on Other Governmental Agencies:** Nothing contained herein limits the rights and authority of the United States to take any civil, tax, immigration/deportation or administrative action against the defendant.

    **c. Supervised Release:** Pursuant to any supervised release term, the Court will impose standard conditions upon the defendant and may impose special conditions related to the crime defendant committed. These conditions will be restrictions on the defendant to which the

defendant will be required to adhere.  Violation of the conditions of supervised release resulting in revocation may require the defendant to serve a term of imprisonment equal to the length of the term of supervised release, but not greater than the term set forth in Title 18, United States Code, Section 3583(e)(3), without credit for the time served after release.  The defendant understands that parole has been abolished.

    **d.  Mandatory Special Assessment:** Pursuant to Title 18, United States Code, Section 3013, the Court is required to impose a mandatory special assessment of $100 per count for a total of $100, which the defendant agrees to pay at the time of sentencing.  Money paid by the defendant toward any restitution or fine imposed by the Court shall be first used to pay any unpaid mandatory special assessment.

    **e.  Possibility of Detention:** The defendant may be subject to immediate detention pursuant to the provisions of Title 18, United States Code, Section 3143.

    **f.  Fines, Restitution and Costs of Incarceration and Supervision:** The Court may impose a fine, restitution (in addition to any penalty authorized by law), costs of incarceration and costs of supervision.  The defendant agrees that any fine or restitution imposed by the Court will be due and payable immediately.  Pursuant to Title 18, United States Code, Section 3663A, an order of restitution is mandatory for all crimes listed in Section 3663A(c).  Regardless of the Count of conviction, the amount of mandatory restitution imposed shall include all amounts allowed by Section 3663A(b) and the amount of loss agreed to by the parties, including all relevant conduct loss.  The defendant agrees to provide full restitution to all victims of all charges in the indictment.

20

**g. Forfeiture:** The defendant knowingly and voluntarily waives any right, title, and interest in all items seized by law enforcement officials during the course of their investigation, whether or not they are subject to forfeiture, and agrees not to contest the vesting of title of such items in the United States. The defendant agrees to abandon his interest in all seized items and further agrees that said items may be disposed of or destroyed by law enforcement officials in any manner without further notice. By abandoning these items, the defendant waives any future rights to receive additional notice, a valuation of the items, or the opportunity to submit a claim to contest the disposition or destruction of the items that may exist under any policies or procedures of the seizing agency(ies).

The defendant agrees the stipulated facts above are sufficient to support forfeiture of certain assets pursuant to the applicable forfeiture authorities. The defendant also agrees to the entry of a forfeiture money judgment against the defendant and in favor of the Government in the amount of $742,528.07. The defendant agrees the Court may enter a consent preliminary order of forfeiture any time before sentencing, and such Order will become final as to the defendant when it is issued and will be part of the sentence. The defendant agrees not to object to any administrative, civil, or criminal forfeiture brought against any assets subject to forfeiture. The defendant will execute any documents and take all steps needed to transfer title or ownership of said assets to the government and/or to rebut the claims of nominees and/or alleged third party owners. The defendant knowingly and intelligently waives all constitutional, statutory, and equitable challenges to any forfeiture carried out in accordance with this plea agreement, including but not limited to that defendant was not given adequate notice of forfeiture in the charging instrument.

21

**9. ACKNOWLEDGMENT AND WAIVER OF THE DEFENDANT'S RIGHTS:**

In pleading guilty, the defendant acknowledges, fully understands and hereby waives his rights, including but not limited to: the right to plead not guilty to the charges; the right to be tried by a jury in a public and speedy trial; the right to file pretrial motions, including motions to suppress or exclude evidence; the right at such trial to a presumption of innocence; the right to require the government to prove the elements of the offenses against the defendant beyond a reasonable doubt; the right not to testify; the right not to present any evidence; the right to be protected from compelled self-incrimination; the right at trial to confront and cross-examine adverse witnesses; the right to testify and present evidence and the right to compel the attendance of witnesses. The defendant further understands that by this guilty plea, the defendant expressly waives all the rights set forth in this paragraph.

The defendant fully understands that the defendant has the right to be represented by counsel, and if necessary, to have the Court appoint counsel at trial and at every other stage of the proceeding. The defendant's counsel has explained these rights and the consequences of the waiver of these rights. The defendant fully understands that, as a result of the guilty plea, no trial will, in fact, occur and that the only action remaining to be taken in this case is the imposition of the sentence.

The defendant is fully satisfied with the representation received from defense counsel. The defendant has reviewed the government's evidence and discussed the government's case and all possible defenses and defense witnesses with defense counsel. Defense counsel has completely and satisfactorily explored all areas which the defendant has requested relative to the government's case and any defenses.

22

The guilty plea could impact defendant's immigration status or result in deportation. In particular, if any crime to which defendant is pleading guilty is an "aggravated felony" as defined by Title 8, United States Code, Section 1101(a)(43), removal or deportation is presumed mandatory. Defense counsel has advised the defendant of the possible immigration consequences, including deportation, resulting from the plea.

**10. <u>VOLUNTARY NATURE OF THE GUILTY PLEA AND PLEA AGREEMENT</u>:**

This document constitutes the entire agreement between the defendant and the government, and no other promises or inducements have been made, directly or indirectly, by any agent of the government, including any Department of Justice attorney, concerning any plea to be entered in this case. In addition, the defendant states that no person has, directly or indirectly, threatened or coerced the defendant to do or refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

The defendant acknowledges having voluntarily entered into both the plea agreement and the guilty plea. The defendant further acknowledges that this guilty plea is made of the defendant's own free will and that the defendant is, in fact, guilty.

**11. <u>CONSEQUENCES OF POST-PLEA MISCONDUCT</u>:**

After pleading guilty and before sentencing, if defendant commits any crime, other than minor traffic offenses, violates any condition of release that results in revocation, violates any term of this guilty plea agreement, intentionally provides misleading, incomplete or untruthful information to the U.S. Probation Office or fails to appear for sentencing, the United States, at its option, may be released from its obligations under this agreement. The Government may also, in its discretion, proceed with this agreement and may advocate for any sentencing position

23

supported by the facts, including but not limited to obstruction of justice and denial of acceptance of responsibility.

\*\*\*\*\*\*\*\*\*\*\*REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK\*\*\*\*\*\*\*\*\*\*\*

## 12. NO RIGHT TO WITHDRAW GUILTY PLEA:

Pursuant to Rule 11(c) and (d), Federal Rules of Criminal Procedure, the defendant understands that there will be no right to withdraw the plea entered under this agreement, except where the Court rejects those portions of the plea agreement which deal with charges the government agrees to dismiss or not to bring.

6/28/2024
Date

AMY E. SESTRIC
Assistant United States Attorney

6/20/2024
Date

SONNY S. SAGGAR, M.D.
Defendant

6/20/24
Date

WILLIAM MARSH
Attorney for the Defendant

6/27/2024
Date

NICHOLAS WILLIAMS
Attorney for the Defendant

24